No. 91,311

EVENSON TRUCKING CO., *Appellant,* v. FRED ARANDA, *Appellee.*

(127 P.3d 292)

Opinion filed February 3, 2006.

*Daniel G. Menzie,* of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, argued the cause, and *Stephen L. Brave,* of the same firm, was on the brief for appellant.

*William J. Graybill,* of Graybill, Witcher & Ambrosier, of Elkhart, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: This case concerns the propriety of court-ordered sanctions against a party. Evenson Trucking Co. (Evenson) filed suit against Fred Aranda for damages to its truck. After the suit was dismissed with prejudice, Aranda filed for sanctions against Evenson, which the district court imposed pursuant to K.S.A. 2004 Supp. 60-211(c). The Court of Appeals reversed the award in *Evenson Trucking Co. v. Aranda,* No. 91,311, unpublished opinion filed December 23, 2004. We granted Aranda's petition for review under K.S.A. 60-2101(b).

The primary issue on appeal is whether the district court erred in imposing sanctions. This determination requires the answers to two different questions as follows:

1. What standard of review applies?
2. Are the district court's findings of fact supported by substantial competent evidence?

We affirm the district court.

## FACTS

On September 10, 1999, a semi-truck owned by Evenson struck a horse while the truck was traveling on a public highway in Morton County. Jason LaRue of the sheriff's office arrived at the scene approximately 16 minutes later. He later filed an accident report that stated the truck was traveling southbound on K-27 when the horse ran onto the roadway causing a collision. The report indicated that the collision caused over $500 in property damage and that the horse belonged to Fred Aranda.

Aranda testified that he later received a demand letter addressed to him at P.O. Box 977, Elkhart, Kansas, from Robert Lasowski, the recovery supervisor for American International Recovery, Inc. (American International) of Parsippany, New Jersey, on behalf of Evenson's insurer, National Union Fire Insurance Company. The letter stated in relevant part:

"November 10, 1999
"Fred Aranda
"P.O. Box 977
"Elkhart, KS 67950

| | |
|---|---|
| "RE:INSURED: | Evenson Trucking |
| CLAIMANT: | Fred Aranda |
| FILE NUMBER: | 197-009498 |
| DATE OF LOSS: | 09-10-99 |
| AMOUNT: | $8,730.73 |

"Dear Mr. Aranda:

"*We are the recovery agents for National Union Fire. Ins. Co.*, who has made payment to their policyholder for damages arising out of the above-cited occurrence. *Our investigation of this loss has determined that you are responsible for these damages.* Since our client is the equitable subrogee of its insured, we request payment on their behalf of this subrogated interest in the above-captioned amount.

"If you are insured, it is suggested for your protection that you immediately contact your insurance carrier with this information. In addition, please enter the name, address and policy number of your insurance carrier at the bottom of this page, and return this information immediately to the address listed above. If you are uninsured, or self-insured, contact the undersigned to arrange for payment. *Otherwise, please send your check or money order, made payable to National Union Fire Ins. Co., in the enclosed self-addressed envelope.*

*"If there is a reason for not paying this claim, please explain fully,* **IN WRITING, WITHIN 30 DAYS.**
"Very truly yours,
"Robert Lasowski
"Recovery Supervisor" (Emphasis added.)

Aranda testified he later prepared a letter of denial to Lasowski's attention at American International in Atlanta, Georgia, — not Lasowski's address in Parsippany, New Jersey. His letter stated:

"P.O. Box 75
"Elkhart, KS 67950
"December 03, 1999
"American International Recovery, Inc.
"P.O. Box 105795                    .
"Atlanta, GA 30348-9864
"ATTN: Robert Lasowksi -Recovery Supervisor
"Dear Mr. Lasowski:
"As requested I am writing in regards to correspondence received from your company dated November 10, 1999. Pertaining to File Number 197-009498, in which your company indicates that I am responsible for damages incurred in the amount of $8730.73.
"I do not feel that I am the person responsible for these damages. I am not the legal owner of the horse that was struck during this occurrence. Nor am I the legal land owner of the property from where the horse allegedly came from. Due to these facts I disagree with the findings of your company's investigation. Payment of this claim will not be made at this time.
"I would greatly appreciate your quick resolution to this situation. Thank you in advance for your cooperation.
"Sincerely,
"Fred Aranda"

Aranda testified that he mailed the letter, prepared for Lasowski's attention at American International in Atlanta, in the self-addressed envelope that Lasowski had enclosed in his November 10, 1999, demand letter. While he did not look at the address printed on Lasowski's self-addressed envelope prior to mailing, he believed that he drafted the letter to Lasowski in Atlanta using the same address that appeared on the provided envelope. Aranda testified concerning the company's receipt of his denial letter as follows:

"Q. Did you attempt to call American National Recovery [*sic*] at their phone numbers up there —

"A. No.
"Q. — and confirm receipt of the letter?
"A. No, because it was — I sent it to — I sent it by — oh, *what do you call that where they notify you if they've received it?*
"Q. Do you have the —
"A. *Certified.*
"Q. *You have the receipt from the certified mail?*
"A. *Yes, I do.*
"Q. Did you bring it with you?
"A. No.
"Q. Have you provided that to your attorney?
"A. I believe so.
"Q. Do you know why he didn't produce it during discovery?
"A. I don't."

Over the next 16 months, American International and two law firms made telephone calls and left messages for Aranda to return the calls. They also sent four additional demand letters (dated February 1, 2000, May 11, 2000, June 19, 2000, and March 30, 2001), to Aranda at P.O. Box 977, Elkhart, Kansas, 67950, the address on Lasowski's original demand letter. Aranda testified that with the exception of the original letter, he did not receive any of the other demand letters or communications until he was served with summons for the lawsuit. He also testified that he changed his address from P.O. Box 977 to P.O. Box 75, Elkhart, Kansas, in late 1999 and speculated that Lasowski's November 10 letter had been forwarded to him by the postal service.

The latest letter, dated March 30, 2001, was from the law firm of Turner & Boisseau and drafted by legal assistant Trudy Moore for the signature of attorney Jeffery Row. It stated that the firm was retained by Evenson

"to represent them concerning the damage done to their vehicle due to your alleged negligence . . . .

. . . .

"Unless you notify us within thirty (30) days after receipt of this letter that the validity of this debt, or any portion of it, is disputed, we will assume that the debt is valid. If you do notify us of a dispute, we will obtain verification of the debt and mail it to you."

Two months later, on May 30, Turner & Boisseau dissolved. Its attorneys and staff members joined Klenda, Mitchell, Austerman & Zuercher, LLC (Klenda, Mitchell).

Approximately 1 month later on July 2, 2001, Evenson filed suit against Aranda because he "negligently allowed a horse to run at large, north of Elkhart, Morton County, Kansas, and as a direct and proximate result of defendant's negligence, plaintiff suffered damages in the amount of $8,730.73." The petition further alleged that "[a]lthough demand has been made upon said defendant for payment of the balance, defendant has failed, refused and neglected to pay the same." While the record on appeal is silent on who prepared the petition, it was signed by attorney Eldon L. Boisseau of Klenda, Mitchell.

On August 24, 2001, Aranda filed an answer denying liability and alleging he did not "own or control the horse in question."

According to the deposition testimony of Klenda, Mitchell's legal assistant Moore, she was the person primarily responsible to ascertain what the accident facts were. She testified she had never tried to contact the Morton County sheriff's office prior to the petition filing on July 2, 2001. Moore also testified that 2 months later, September 10, 2001, was the first time she spoke with the sheriff's office. She called and asked a female dispatcher for a copy of the "accident report, the investigative report." When the dispatcher faxed the accident report, Moore called back and asked that same person for the entire file because she had received only the accident report. The dispatcher relayed that the accident report was all the sheriff's office had.

Moore also testified that she called the sheriff's office the next day, September 11, 2001, at 8:14 a.m. She spoke with someone that she recalled as Officer LaRue to ask how he knew the horse belonged to Aranda. According to Moore, LaRue replied that "it was a small community and everybody pretty much knew what everybody else had or what animals belonged to who, and he knew that horse belonged to Mr. Aranda."

Moore further testified that she also called the sheriff's office on September 12 to see if there was a city or county ordinance that forbade animals to run at large. She never talked to the sheriff's office again. That same day she called the clerk of the district court, the county clerk, and the county attorney regarding "containment

of farm animals" and learned there were no ordinances prohibiting animals running at large.

Other parts of Moore's testimony, however, are less clear because several times she testified that her telephone calls to the sheriff's office and other Morton County authorities were done before the suit was filed on July 2, 2001. For example, she testified she made the initial call on September 10 because: "We hadn't had any contact [with Aranda]. And I was instructed to pursue it further, do an investigation that might need to be done, in order for us to go ahead and make sure that we were comfortable with the *information we had to file a petition.*" (Emphasis added.)

She continues this refrain:

"Q. Okay. So the purpose of your calls to the sheriff's department was to make sure that the information that you — verify the information that you had to support *so you could go ahead and file your petition?*

"A. Correct.

"Q. Okay. To your knowledge had any of that investigation been done prior to your beginning your contact with the sheriff's department?

"A. I don't know.

. . . .

"Q. And these items that you have described as your involvement with this file, as I understand it from your testimony you do that as a matter of course *to make sure everything is lined up so you can get your petition filed and go ahead with the lawsuit?*

"A. Correct.

. . . .

"Q. Then other than that letter [March 30, 2001, demand to Aranda drafted by Moore for her law firm] and the investigation that you conducted with your conversations with the Morton County sheriff's department, did you have any other involvement with the file *prior to the petition being filed?*

"A. Yes, I did.

"Q. Okay. What would that have been?

"A. A telephone call to the district clerk's office — I am sorry — yeah, the district clerk's office checking on an [animal containment] ordinance and a call to the county attorney's office checking on the ordinance." (Emphasis added.)

On cross-examination by her employer, she reiterates that her telephone calls to the sheriff's office and other Morton County authorities, which she testified had occurred in September, had been made before the suit was filed in July:

"Q. [by Mr. Stephen L. Brave]: *Prior to the filing of the lawsuit did you discuss the findings of your investigation with any attorneys?*

"A. *Yes, I did.*

"Q. Do you remember who you spoke with?

"A. I believe I spoke with you and prior — well, to you.

"Q. Do you remember if you spoke with [employing attorney] Eldon Boisseau?

"A. I may have.

"Q. And did you relate the findings of your investigation?

"A. Yes, I did.

"Q. Do you recall what you told either myself [Mr. Brave] or Mr. Boisseau were the results of your investigation?

"A. Yes, I do.

"Q. For the record —

"A. What I told you guys would be that *I had made the telephone calls, and the police department verified that it was Mr. Aranda's horse, that there wasn't any further investigative reports, and that I had tried to find out whether or not there was an ordinance against the animal running at large, and I had not found that out.*" (Emphasis added.)

When asked, "How did you originally know or what led you to believe that Fred Aranda was the owner of the horse?" Moore testified, "It was on the police report." She also testified that no letters from Aranda were contained in the materials forwarded by the insurance company, which suggests the law firm had received some files.

However, although she testified she had spoken with LaRue on September 11, her annotations on the firm's telephone bill, a deposition exhibit, show that this particular conversation occurred on September 26.

According to LaRue's testimony, he had never been contacted by Moore or anyone else from Wichita. He stated that the sheriff's office logs its incoming calls and he reviewed the call logs for 1999, 2000, and 2001. He found no call log entry indicating that a phone call was received from Trudy Moore for him. He also testified that he has no recollection of ever talking with Trudy Moore. He further did not believe that the sheriff's dispatch ever told him that anyone from Wichita had called regarding the accident. At no time after he wrote his report on September 10, 1999, did anyone except Aranda's counsel ever ask him if Aranda owned the horse.

On October 15, 2001, verified answers to Aranda's interrogatories were signed by Evenson's attorney Todd Allison. They provide, among other things:

"3. Please identify by name and address and job title, each person who investigated on your behalf the facts of the incident on September 10, 1999, on which your Petition is based.

"ANSWER: Plaintiff has not had anyone investigate this incident on their behalf. Morton County Under Sheriff, J. [LaRue], however did investigate this accident and filed a report which Plaintiff has relied upon.

"4. For each person identified in Paragraph 3 above, please describe all acts, actions or activities that person did in the course of their investigation of the facts of the incident of September 10, 1999, on which your Petition is based.

"ANSWER: Plaintiff has not had anyone investigate the incident on his behalf. The actions of Under Sheriff [LaRue] are contained in his report.

. . . .

"7. Please describe the efforts made by you to determine that the Defendant owned or controlled the horse described in Paragraph 3 of your Petition.

"ANSWER: Accident Investigative Report by Morton County Under Sheriff [LaRue] named Fred Aranda as the owner of the deceased horse that was the cause of this accident."

The answers do not specify at what point Evenson received LaRue's accident report, *e.g.*, before or after suit was filed, and therefore cannot disclose whether Evenson relied upon the report in preparing and filing the petition. These interrogatory answers were later provided to the district court as Aranda's Exhibit 5 at the sanctions hearing on June 12, 2003.

On October 29, 2001, verified answers to Aranda's interrogatories were signed by Evenson's vice president and by someone for attorney Eldon Boisseau. The interrogatories and answers are identical to those of October 15, 2001, described earlier in the opinion. These also were later provided to the district court as Aranda's Exhibit 5 at the June 12, 2003, sanctions hearing.

On April 11, 2002, attorney Erin Syring of Klenda, Mitchell filed Plaintiff's Motion to Dismiss without prejudice. On April 23, Defendant's Response was filed, asking for dismissal with prejudice and costs awarded to Aranda. He argued that dismissal with prejudice was warranted because while Aranda had notified Evenson via his letter of December 3, 1999, that he did not own the horse, Evenson failed to conduct any discovery addressing Aranda's denial

of the allegations until November 19, 2001. In support, Aranda attached as Exhibit C a copy of Plaintiff's Answers to Defendant's Interrogatories, which were not dated or signed but which identified in handwriting on the signature page Stephen L. Brave as the attorney of the plaintiff.

Although responding to the same interrogatories mentioned earlier, this document contains slightly different answers than the one provided and signed by Evenson's attorney Todd Allison on October 15, 2001, and the one containing the verified signature of Evenson's vice president on October 29, 2001. Unlike the signed answers, these specifically express that the plaintiff relied upon the findings in the undersheriff's report to prepare the petition. They also clarify that Evenson did not independently investigate the accident. Additions are in italics as follows:

"3. Please identify by name and address and job title, each person who investigated on your behalf the facts of the incident on September 10, 1999, on which your Petition is based.

"Answer: The Plaintiff has not had anyone *independently* investigate this incident on its behalf. Morton County Under Sheriff, J. [LaRue], however, did investigate this accident and filed a report *containing his findings*, which Plaintiff has relied upon *in preparing its Petition.*

"4. For each person identified in Paragraph 3 above, please describe all acts, actions or activities that person did in the course of their investigation of the facts of the incident of September 10, 1999, on which your Petition is based.

"Answer: The actions of Under Sheriff [LaRue] are contained in his report. [Omitting the earlier statement that 'Plaintiff has not had anyone investigate the incident on his behalf.']

. . . .

"7. Please describe the efforts made by you to determine that the Defendant owned or controlled the horse described in Paragraph 3 on your Petition.

"Answer: *Plaintiff reviewed the* Accident Investigative Report prepared by Morton County Under Sheriff [LaRue], which names Fred Aranda as the owner of the deceased horse that was the cause of this accident. *Plaintiff has also contacted a dispatcher for the Morton County Sheriff's Office, who also reported that the Defendant owned the horse which caused this accident.*" (Emphasis added.)

During a pretrial conference on April 24, 2002, the parties, through Evenson counsel Stephen L. Brave and Aranda's William Graybill, orally agreed to a dismissal with prejudice and the costs

to be taxed to the plaintiff. The court approved. Among other things, Evenson's counsel stated:

"Your Honor, at this point, I don't see why we wouldn't agree to dismiss it with prejudice. I don't think — you know, we did do discovery in this case. We had a sheriff's report. The sheriff's report of this accident claimed that Mr. Aranda was the owner of the horse. We spoke to — it wasn't the sheriff, it was an undersheriff named LaRue that we contacted. At that point, he said, 'Yeah, I'm going to stand by the report.' We did send off written discovery to defendant. He responded back saying, you know, 'It's not my horse, I had nothing to do with this.'

"And at that point, we contacted the sheriff again, it's my understanding. I didn't do it personally. And at that point — well, the sheriff is like, 'Well, that may be the case.' *That's the reason we filed this motion* [to dismiss], *is there's no way we're going to be able to, you know, go through the full discovery for a case that's worth $8,000. The client doesn't want to do it. It's not worth it."* (Emphasis added.)

Shortly thereafter, on May 3, 2002, Aranda filed a motion to determine costs and for sanctions against Evenson pursuant to K.S.A. 2004 Supp. 60-211. Essentially reiterating his April 23 response, Aranda alleged that Evenson failed to make a "reasonable inquiry" as to the ownership of the horse in question after Aranda disclaimed ownership in December 1999. He attached the copy of the Plaintiff's Answers to Defendant's Interrogatories, signed by someone for Boisseau and containing the Verification page signed and sworn to by the vice president of Evenson.

Approximately 1 month later, on June 7, 2002, Aranda served a notice to take the deposition of Evenson attorneys Eldon Boisseau, Erin Syring, and Todd Allison on June 14, 2002, and issued subpoenas for their attendance. On June 10, 2002, the plaintiff fax filed a motion to quash.

On June 17, 2002, a journal entry was filed dismissing Evenson's original suit with prejudice in confirmation of the oral dismissal on April 24, 2002. Costs were assessed to the plaintiff. This filing left for resolution only Aranda's motion to determine costs and for sanctions.

On June 19, 2002, Evenson filed a motion for protective order regarding the proposed depositions of Boisseau, Syring, and Allison. It asked for Aranda to pay its reasonable attorney fees incurred in filing/preparing the motion, alleging that because the case had been dismissed with prejudice, it was pointless to proceed with

discovery. Evenson later told the court that none of the three attorneys would be testifying at the hearing on Aranda's motion for sanctions.

Based upon this representation and to avoid the problems in allowing "opposing counsel to depose opposing counsel," on July 8, 2002, the court signed a journal entry quashing the subpoenas and granting the protective order. However, it allowed some discovery to proceed on the issue of sanctions:

"At the time of oral argument counsel for the Plaintiff stated that actions taken by a paralegal investigating the Plaintiff's claim against the Defendant was done by the paralegal making a telephone call to a deputy sheriff in Morton County.

"That being the case and, if this is indeed the defense raised by the Plaintiff, that paralegal who is going to testify in this proceeding could certainly be deposed if the Defendant chose to do so as to the actions taken by her and her proposed testimony, if any, to be offered in response to the Defendant's Motion."

Accordingly, approximately 8 months later, on March 19, 2003, Aranda's counsel eventually deposed the paralegal, Moore, as excerpted earlier in the opinion.

On June 5 and 11, 2003, Evenson then filed its own Motion for Sanctions and Memorandum pursuant to K.S.A. 2004 Supp. 60-211. It attached as Exhibit B the copy of the unsigned Plaintiff's Answers to Defendant's Interrogatories containing attorney Stephen L. Brave's name — the same document that Aranda had supplied to the court on April 23, 2002, as an exhibit to its Response to Plaintiff's Motion to Dismiss. As mentioned, the answers clearly express plaintiff's reliance upon the findings in the undersheriff's report in preparing the petition.

On June 12, a hearing was conducted regarding the parties' opposing motions for sanctions. The court heard testimony, including Aranda and Undersheriff Jason LaRue, and received exhibits — letters and interrogatory answers, documents detailing Aranda's and Evenson's attorney fees, and the deposition transcript of Moore with attached telephone records showing calls to the sheriff's office in September 2001. Among other things, LaRue also testified that although his report showed Aranda was the horse owner, he could not recall how he came up with that information. He also testified that his report did not indicate anyone one was

negligent and that he saw no indication in his investigation that the horse was actually on the highway as the result of someone's negligence.

Evenson sought to admit certain demand letters as exhibits, arguing they were party admissions "since, you know, the party's [Evenson] agent [attorneys and American International] wrote them."

On July 8, 2003, the court filed a seven-page journal entry awarding sanctions to Aranda. Among other things, the court found that LaRue made no inquiries or investigation to support his allegation that Fred Aranda was the owner and it was unknown why he believed Aranda was the owner; that Aranda received the November 10, 1999, letter from American International; that the letter indicated American International was an agent for National Union Fire Insurance Company with an Atlanta address; that Aranda wrote a letter dated December 3, 1999, addressed to American International at the Atlanta address to the attention of the name on the demand letter from American International; that Aranda's letter indicated his address was P.O. Box 75, Elkhart; and that Aranda's letter denied he was the owner of the land or the horse and therefore denied payment.

The court also found Aranda's address had changed from Box 977 to Box 75 sometime late in 1999; that further demand letters were sent to Aranda at Box 977 by American International, a New Jersey law firm, and finally a letter was sent dated March 30, 2001, from Turner and Boisseau; and that Aranda received none of these letters. The court also found that suit was filed against Aranda on July 2, 2001, and he denied liability and ownership and control of the horse in his answer.

Regarding Evenson's presuit knowledge of the horse ownership, the court further found:

"During discovery, after the filing of the Defendant's Motion for Sanctions, the paralegal, working for counsel for the Plaintiff, was deposed and testified that part of her job duties was the investigation of claims to be made before suit was filed. *It is clear she made no investigation before filing of the suit excepting the drafting of the demand letter while still in the employ of Turner & Boisseau.* This paralegal did not explain how she had determined the P.O. Box 977 number as being

Aranda's address. [But] [t]his witness testified that she had received the file forwarded to the law firm from the insurance company.

"On September 10, 2001, September 11, 2001, and September 12, 2001, a paralegal from the Plaintiff's law firm placed phone calls to the Morton County Sheriff's office, the Morton County Attorney's Office, and the Morton County Clerk's.

"The first call placed by the paralegal in charge of the investigation was made on September 10, 2001, and she asked for a copy of the accident report.

"On September 11, 2001, the paralegal then called the deputy who investigated the accident to verify details of the accident report.

. . . .

"*It is very clear that no one in the law firm made any investigation prior to the filing of the lawsuit, other than sending the one demand letter to the wrong address.*

"At the time the Defendant's Motion for sanctions was heard by this Court [June 12, 2003], the Plaintiff presented no evidence other than a copy of the accident report and a copy of their claim for attorney fees for their Motion for Sanctions to be applied against the Defendant for filing a frivolous motion.

"The counsel for the Plaintiff made the statement [in the April hearing] that the reason the suit was abandoned and dismissed with prejudice was because it was not economically feasible to litigate the case to prove that Aranda was the owner or in control of the horse that caused the accident.

"If it was not economically feasible to pursue the case to prove negligence on behalf of Aranda, the question then becomes why was the case filed in the first place?

. . . .

"If the counsel for the Plaintiff received the insurance file as they claim they did, they should have seen Aranda's letter in there, and then made reasonable inquiry before filing this suit, which they did not do.

"*The paralegal in charge of the pre-suit investigation did not even obtain the accident report until September 10, 2001. This lawsuit had been filed on July 2, 2001, over sixty days before the paralegal got the accident report upon which the Plaintiff relies for their claim against Aranda.*" (Emphasis added.)

After citing *Bus. Opportunities Unlimited, Inc., v. Envirotech Heat. & Cooling, Inc.*, 26 Kan. App. 2d 616, 992 P.2d 1250 (1999), the court concluded that no reasonable presuit inquiry had been made and Aranda should be awarded costs and expenses for attorney fees in the amount of $9,837.85 with interest against Evenson pursuant to K.S.A. 2004 Supp. 60-211. It also denied Evenson's Motion for Sanctions.

Evenson filed a motion for reconsideration which was heard on August 27, 2003. On September 1, 2003, the court filed its order denying reconsideration. It specifically found:

"After hearing oral argument and reading the Plaintiff's Motion for Reconsideration, this Court has reviewed the evidence herein *and in particular the testimony of the paralegal who was in charge of the investigation of the claim against the Defendant.*

"Counsel for the Plaintiff has argued that the testimony of that paralegal could be interpreted to indicate the paralegal was in possession of an accident report naming Aranda owner of the horse prior to the day the lawsuit was filed against Aranda.

"This Court has re-read that testimony and disagrees and finds specifically, without any doubt whatsoever, *the paralegal did not have the accident report which named Aranda as the owner of the horse until some 60 days after this lawsuit was filed and, therefore, could not have performed an investigation prior to the suit being filed.*" (Emphasis added.)

The court further found that Evenson's allegation that Aranda's denial letter was not in the insurance company file is unsupported by evidence because the file was not in evidence. It also specifically found that "this Court simply believes Mr. Aranda" that he sent the letter. It further found that National Union Fire Insurance Company in Atlanta ignored the letter and that the company apparently did not forward Aranda's letter to its counsel when it sent the insurance file. Finally, the court found that sending demand letters to the wrong address is not "investigation."

Evenson appealed, and a majority of the panel of the Court of Appeals reversed the district court's imposition of sanctions after finding that the district court's findings of fact were not supported by substantial competent evidence. Judge Marquardt dissented, holding that the correct standard of review is whether the district court abused its discretion in imposing sanctions.

## ANALYSIS

Issue 1: *What standard of review applies?*

Aranda first argues that the Court of Appeals applied the wrong standard of review in reversing the district court's award of sanctions pursuant to K.S.A. 2004 Supp. 60-211.

K.S.A. 2004 Supp. 60-211 states in relevant part:

"(b) The signature of a person [on a pleading] constitutes a certificate by the person that the person has read the pleading, motion or other paper and that *to the best of the person's knowledge, information and belief formed after an inquiry reasonable under the circumstances*:

. . . .

(3) *the allegations and other factual contentions have evidentiary support* or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; . . .

. . . .

"(c) . . . If a pleading, motion or other paper provided for by this article is signed in violation of this section, the court, upon motion or upon its own initiative upon notice and after opportunity to be heard, *shall impose* upon the person who signed it or a represented party, or both, an appropriate sanction, *which may include* an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including reasonable attorney fees. A motion for sanctions under this section may be served and filed at any time during the pendency of the action but not later than 10 days after the entry of judgment." (Emphasis added.)

Based on the plain language in subsection (c), sanctions are mandatory when a pleading is signed in violation of the statute. The court in *In re Marriage of Stockham*, 23 Kan. App. 2d 197, 201, 928 P.2d 104 (1996), *rev. denied* 261 Kan. 1085 (1997), repeated the clarification of the past standard:

"At one time the decision whether to impose sanctions under 60-211 was a matter of judicial discretion, if an attorney violated the statute willfully, knowingly, and in bad faith. Under the current version of 60-211, as well as 60-2007, sanctions are no longer a matter of discretion; they *shall be imposed* if the requirements of the statute are shown to be present. [Citations omitted.]" (Emphasis added.) 23 Kan. App. 2d at 201.

Accordingly, when an appellate court reviews a district court's decision to impose sanctions under K.S.A. 60-211

"the appellate court's function is to determine whether substantial competent evidence supports the trial court's findings of fact that the statutory requirements for sanctions are present. *In re Hesston Corp.*, 254 Kan. 941, 988, 870 P.2d 17 (1994); *Giblin v. Giblin*, 253 Kan. 240, 252, 854 P.2d 816 (1993)." 23 Kan. App. 2d at 201.

Aranda, however, contends that the correct standard of review is "abuse of discretion." He points to Judge Marquardt's dissent, citing *Wood v. Groh*, 269 Kan. 420, 429, 7 P.3d 1163 (2000), for

support. *Wood* states: "The imposition of sanctions pursuant to K.S.A. 1999 Supp. 60-211 is discretionary with the trial court, and its ruling on sanctions will not be disturbed on appeal absent an abuse of discretion. [Citations omitted.]" 269 Kan. at 429.

*Wood,* however, is not incongruous with *Stockham.* The question in *Wood* was not whether the statutory requirements to award sanctions were satisfied; rather, the issue was whether the *type* of sanction imposed was error:

"The plain wording of K.S.A. 1999 Supp. 60-211(c) requires that a district court 'shall impose' a sanction when a violation of K.S.A. 1999 Supp. 60-211(b) is found, as in this case. The statute, however, does not specifically require a sanction of attorney fees, as it gives the district court the discretion to apply 'an appropriate sanction.' Further, the statute indicates that the sanction 'may include' attorney fees. The statute does not require a district court to award monetary sanctions for a violation of 60-211(b). The word 'sanction' does not require courts to award 'fees'. . . .

. . . .

"We hold that the plain meaning of K.S.A. 1999 Supp. 60-211(c), coupled with the legislative intent of the statute, allows courts to impose nonmonetary sanctions in the form of admonitions, as well as monetary sanctions. Courts are not required to award attorney fees when a violation of K.S.A. 1999 Supp. 60-211(b) is found. *The district court has the discretion to determine what type of sanctions are appropriate in a given case.*" (Emphasis added.) 269 Kan. at 430-31.

Because the only question on appeal is whether the court erred in imposing sanctions, not whether the court erred in imposing a certain type of sanction, the abuse of discretion standard does not apply. The Court of Appeals correctly determined that substantial competent evidence is the standard of review.

Issue 2: *Are the district court's findings of fact supported by substantial competent evidence?*

Next, Aranda argues that even if the Court of Appeals determined the correct standard, that substantial competent evidence supports the district court's findings. "Substantial evidence is that which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. [Citation omitted.]" *U.S.D. No. 233 v. Kansas Ass'n of American Educators,* 275 Kan. 313, 318, 64 P.3d 372 (2003). More-

over, we note that during our review for such evidence we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. We also accept as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court. 275 Kan. at 320.

### *The receipt of Aranda's letter of denial*

The district court summarized its core findings as follows:

"The facts that have led the Court to its conclusion are simple. The party standing behind the Plaintiff and probably in all likelihood, the real interested party in this suit is National Union Fire Insurance Company. *They received information from Aranda* within two months of this accident that he was not the owner of the horse and was not responsible for the damage to their insured.

"The Plaintiff, nevertheless, insisted on attempting to collect damages from Aranda and they should not have done so.

"If the counsel for the Plaintiff received the insurance file as they claim they did, they *should have* seen Aranda's letter in there, and then made reasonable inquiry before filing this suit, which they did not do." (Emphasis added.)

Upon reconsideration, the district court reiterated: "What did National Union Fire Insurance Company do with that letter? Nothing. Apparently, they ignored it. This is the wrong; this is what is bad in this case. Apparently, they never even included it in the 'insurance file' that was eventually sent to their counsel in this proceeding."

The Court of Appeals acknowledged that Aranda claimed he sent, by certified mail, his denial letter in the self-addressed envelope that accompanied Lasowski's demand letter. Nevertheless, it held that the record does not contain any evidence to support a finding that Aranda's letter was *received*:

"We acknowledge that the district court heard testimony of Aranda and apparently chose to believe that Aranda did indeed respond to the first demand letter and mailed his response in the self-addressed envelope. We do not and need not quarrel with this finding. The problem is that the district court based its conclusion on the improper inference that if Aranda took these steps, the letter must have been *received* by Evenson's agents or attorneys. This was unsupportable by if not contrary to the evidence. . . .

. . . .

"There was simply no evidence offered on the issue of *receipt* of Aranda's letter. In fact, the insurance company was not a party to the proceeding and was not

subpoenaed or deposed on the question of *receipt*. There is no presumption that incorrectly addressed mail is received. See *Miller v. Kansas City C. of C.*, 141 Kan. 459, 462, 41 P.2d 715 (1935); see PIK Civ. 3d 102.74. Absence of evidence on the question of whether the letter was properly addressed deprives the letter of the presumption of delivery. *Breedlove v. General Baking Co.*, 138 Kan. 143, 144, 23 P.2d 482 (1933)." (Emphasis added.) *Evenson Trucking Co. v. Aranda*, slip op. at 5-6.

We disagree with the Court of Appeals for several reasons. First, substantial competent evidence supports the district court's finding of receipt.

According to Aranda's hearing testimony, he possessed a receipt from certified mail that had been mailed to the address contained on a self-addressed envelope provided by Lasowski's demand letter. While that envelope is not in the record on appeal, a copy of Aranda's enclosed letter of denial is; it is addressed to American International Recovery, Inc., P.O. Box 105795, Atlanta, Georgia. A court therefore can infer that the envelope containing Aranda's letter of denial carried an identical address — again, provided by Lasowski. See *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. at 320 (appellate court accepts as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court).

A court can also infer that because Aranda testified he had not called to verify the addressee's receipt of the letter because he had the certified mail receipt, that the receipt in his possession demonstrated successful delivery, *e.g.*, a receipt signed by the addressee. See *Rounsavell v. Tipton*, 209 Kan. 366, 368, 497 P.2d 108 (1972) (when using certified or restricted delivery, reliance on the presumption of delivery is substituted by the sureness of proof by the return receipt). The court in *Moya v. United States*, 35 F.3d 501, 504 (10th Cir. 1994), addressed the significance of the sender not having the receipt:

"While the law presumes delivery of a properly addressed piece of mail, no such presumption exists for certified mail where the return receipt is not received by the sender. [Citation omitted.] The reason is that the sender of a certified letter who does not receive the return receipt is on notice that the addressee may not have received the letter. [Citation omitted.] It is then incumbent upon the sender either to inquire with the addressee or send the letter again."

Second, the Court of Appeals' declaration that there is "no presumption that incorrectly addressed mail is received," is inapplicable here. *Evenson*, slip op. at 6. The district court found: "[A]fter the original demand letter from the Plaintiff through their agent, Aranda responded in writing directly to the insurance company for the Plaintiff and denied his involvement." We observe that according to Aranda's testimony and his copy of the denial letter, the letter was mailed — in the self-addressed envelope Lasowski provided — to the Atlanta address for National Union Fire Insurance Company, the company for whom Lasowski admitted in his letter he and his organization (American International) served as "recovery *agents*." (Emphasis added.) We also observe that Evenson's counsel argued at the sanctions hearing that the demand letters were admissible into evidence because they had been written by Evenson's agents. Accordingly, Aranda's letter was properly addressed to Lasowski's principal at P.O. Box 105795, Atlanta, Georgia.

We acknowledge that Aranda's failure to provide the return receipt during discovery — or to introduce it into evidence at the hearing — could create a presumption that no such evidence existed, or was adverse to him. See *Blackburn v. Colvin*, 191 Kan. 239, 244, 380 P.2d 432 (1963) (failure of a party to throw light upon an issue particularly within his or her own knowledge raises a presumption that the concealed information is unfavorable to him or her); PIK Civ. 3d 102.73. However, by its finding of receipt, the district court essentially determined that any such presumption was rebutted.

*The undersheriff's report*

As mentioned, the district court also found that no one in Evenson's law firm made any investigation prior to the filing of the lawsuit, other than sending the one demand letter to the wrong address. Regarding Evenson's alleged reliance upon the undersheriff's report as basis for filing suit, the court specifically found that Moore, who was in charge of the presuit investigation, did not even obtain the accident report until September 10, 2001, over 60

days after suit had been filed on July 2, 2001. The court affirmed this finding of fact in its order denying reconsideration.

The Court of Appeals found that Evenson's presuit inquiry was reasonable under the circumstances. It specifically noted that counsel had not only relied upon (1) the lack of response to at least four demand letters that were apparently addressed to Aranda at his previous address (receipt of Aranda's responsive letter of denial is discussed earlier in our opinion), but also (2) the formal police report naming Aranda as the responsible party.

"We decline to construe K.S.A. 2003 Supp. 60-211 as requiring a re-investigation of information compiled or reflected in third-party sources that are generally accepted as reasonably authoritative under the circumstances. The identification of Aranda as the responsible party in a formal police report, together with reasonable attempts to confirm the facts through letters of inquiry or demand seems reasonable under these circumstances. See *Nelson v. Miller*, 227 Kan. 271, 278-85, 607 P.2d 438 (1980). Although it may be unfortunate that the letters were directed to the wrong address, we disagree with the district court in its apparent conclusion that errant addresses on the demand letters was some evidence of bad faith by Evenson. Again, there is no record support for the inference that Evenson or its insurers knew or should have known that Aranda had moved and had a new address. In examining the reasonableness of counsel's efforts, we also believe that it is material that the amount of the claim was less than $10,000, thus making any more time-consuming and expensive pre-suit inquiry unwarranted under the circumstances." *Evenson Trucking Co. v. Aranda*, slip op. at 7.

We disagree with the Court of Appeals determinations suggesting Evenson's presuit possession of the undersheriff's report for several reasons. First, the Court of Appeals overlooks the district court's finding, both original and repeated in denying the motion for reconsideration, that Evenson's law firm did not receive the report until after suit had been filed. Because of this oversight, the Court of Appeals makes no search of the record to determine if the finding is supported by substantial competent evidence. Second, it mistakenly, and solely, relies upon representations made by Evenson's counsel that the report was contained in the investigative file received from the insurance company prior to filing suit.

Regarding whether the district court finding is supported by substantial competent evidence, Moore's deposition testimony provides it. Although she testified she performed a presuit investiga-

tion, that testimony is contradicted by the dates she provided, *e.g.*, September 2001, 2 months after suit was filed. Accordingly, the district court could easily find that her investigation was not actually performed until after suit was filed. On appeal, we do not weigh conflicting evidence. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. at 320.

We acknowledge that Moore did testify she believed Aranda was the horse owner because "[i]t was on the police report." However, the only evidence in the record indicating when she got the report was her testimony that it was faxed to her on September 10, 2001. There is no evidence in the record that she obtained the report from the insurance company before suit was filed 60 days earlier and no evidence that she *ever* received a copy from the company. While the petition alleged that Aranda was the owner, and an inference could be drawn that the allegation was based upon the undersheriff's report, an inference could also be drawn, and a finding made, that the report was not obtained until later. The petition's allegation instead could have been based upon rumor, conjecture, a partial investigation, or a combination of these factors, *i.e.*, an allegation not based upon any reliable fact. Moore also testified she essentially was the only investigator for the firm before suit was filed; if she did not clearly testify that she received the report, or read it, before the suit was filed, there is no evidence that anyone else for Evenson did either. As mentioned, the record is silent on who prepared the petition.

There is also the matter of Evenson's inconsistent interrogatory answers in the record. While the sequence of the documents is unclear, it can be inferred that the unsigned answers represent only a draft. They expressly and specifically state that Evenson relied upon the findings in the undersheriff's report to prepare the petition. Accordingly, the signed versions came later; perhaps because of reflection by their preparer, they remove any reference to reliance upon the report for petition preparation.

In short, there is substantial competent evidence in the record for the district court to find that Evenson's firm did not have the undersheriff's report before suit was filed, and therefore could not have relied upon it to prepare the petition. Because the district

court's findings are supported by substantial competent evidence, we cannot reverse them. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. at 320 (During the review of the record for substantial competent evidence, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. We also accept as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court.).

Regarding representations by Evenson's counsel, the Court of Appeals held that "Evenson's counsel explained to the court that the police report was contained in the investigative file from the insurer prior to filing the suit and that counsel had not 'just kind of named Mr. Aranda at random.'" *Evenson*, slip op. at 7. The problem with the Court of Appeals' statement is that there is no evidence in the record on appeal to support this attorney's allegation. Attorney arguments are not evidence. See *Kenyon v. Kansas Power & Light Co.*, 17 Kan. App. 2d 205, Syl. ¶ 3, 836 P.2d 1193 (1992) (Assertions or arguments of counsel before the trial or appellate courts or in appellate briefs neither constitute evidence nor remedy inadequacy in the record on appeal.).

The minimalist strategy employed by Evenson and its counsel is also worth noting. The district court correctly found that when they learned that horse ownership was in dispute in the lawsuit, they dismissed the case because it was not worth the costs of discovery; that when Aranda sought to depose Evenson's three attorneys on the sanctions issue, they moved to quash, obtained a protective order, and represented that their paralegal had the relevant information; and that at the sanctions hearing, they called no witnesses and introduced no exhibits other than a copy of the accident report and a copy of their claim for attorney fees. We also observe that at the deposition of paralegal Moore, they made no effort to clarify the contradictions in her testimony. While their chosen strategy is certainly their prerogative, such an approach runs the risk of failing to address Aranda's argument that they made no inquiry that was reasonable under the circumstances to demonstrate that their petition's "allegations and other factual contentions have evidentiary support." See K.S.A. 2004 Supp. 60-211(b)(3).

Evenson argues in the alternative that even if it did not obtain the undersheriff's report until after suit was filed, the independent third-party report did show that Aranda owned the horse. It therefore asserts that no sanctions can be imposed. This is incorrect. One must certify reasonable investigation and factual basis when the suit is filed, not later. See *Reyna v. General Group of Companies*, 15 Kan. App. 2d 591, 599, 814 P.2d 961, *rev. denied* 248 Kan. 996 (1991) (court must address whether a reasonable basis in fact for the claim existed at the time it was made).

To be clear, this court's opinion is not prohibiting a plaintiff or its counsel from relying upon a law enforcement report as a basis for filing a lawsuit. We simply need not address that issue in the present case because we affirm the district court's finding that the report was not in Evenson's possession before suit was filed; hence, it could not have been relied upon.

In short, we hold that substantial competent evidence supports the district court's findings that Evenson conducted no presuit investigation; that Evenson did not obtain the undersheriff's accident report before filing suit (and therefore could not have relied upon it); and that Evenson's insurance company received Aranda's letter of December 3, 1999, denying liability. Accordingly, the elements for sanctions under K.S.A. 2004 Supp. 60-211 have been met.

*Appellate attorney fees*

On November 7, 2005, Aranda filed a motion seeking permission to file a motion for appellate attorney fees out of time. He acknowledged that his motion was due November 4, 2005, but his motion was "inadvertently not filed" until November 7. Evenson opposes the motion, arguing that under Rule 7.07(b) (2005 Kan. Ct. R. Annot. 56) the motion is untimely. The rule states in relevant part:

"Appellate courts may award attorney fees for services on appeal in any case in which the trial court had authority to award attorney fees.

. . . .

"The motion shall be filed with the clerk of the appellate courts no later than fifteen (15) days after oral argument."

The rule does not establish the standard for consideration of untimely motions. However, Rule 5.02 (2005 Kan. Ct. R. Annot. 33) generally concerns extensions of time and provides that "[n]o extension will be granted except on stated grounds reasonably indicating the necessity therefor." *Cf.* K.S.A. 60-206(b)(2) (upon motion made after the expiration of the specified period a judge may extend the time for "excusable neglect"). Lateness in filing simply because of inadvertence does not meet any standard of relief under these circumstances. The motion is denied.

The judgment of the district court is affirmed. The Court of Appeals is reversed.

LOCKETT, J., Retired, assigned.