(170 P.3d 414)
No. 97,132

RICHARD WILLIAMS, *Appellee/Cross-appellant*, v. DR. STEVE LAWTON, *Appellant/Cross-appellee*.

Opinion filed October 26, 2007.

*Amy S. Lemley, James D. Oliver,* and *Brooke Bennett Aziere,* of Foulston Siefkin, LLP, of Wichita, for appellant/cross-appellee.

*Lawrence W. Williamson, Jr.,* of Shores, Williamson, and Ohaebosim, LLC, of Wichita, for appellee/cross-appellant.

*Peter S. Johnston* and *Dustin J. Denning,* of Clark, Mize, & Linville, Chartered, of Salina, for *amicus curiae* Kansas Association of Defense Counsel.

Before RULON, C.J., GREENE, J., and LARSON, S.J.

GREENE, J.: In this interlocutory appeal in a medical malpractice case, the district court certified three questions for review, all of which arise from its order granting a new trial after a verdict finding defendant Dr. Steve Lawton 54% at fault for injuries to plaintiff Richard Williams and awarding $200,000 for past and present pain and suffering and $1,775,000 for future pain and suffering. We review and answer the certified questions, but we also view the certified questions as being inextricably linked to the entirety of the order granting a new trial, and we reverse that order and remand with directions to reinstate the verdict of the jury.

## Factual and Procedural Background

Williams was an adult father of four upon becoming a patient of Lawton on January 24, 2002, complaining of a urological lesion that would not heal. The medical history form did not specifically request information about diabetes, and no urinalysis was ordered by Lawton. On February 1, 2002, Lawton performed an outpatient

surgery on Williams. Thereafter, a host of severe problems developed including pain, an unusual protrusion, urination issues, a lack of sensation, and other unusual symptoms. Williams remained in Lawton's care until May 2002, after which he sought advice from another physician.

On August 11, 2004, Williams filed an action against Lawton alleging negligence in failing to order a urinalysis prior to the surgery, which would have alerted Lawton to undiagnosed diabetes. Additionally, Williams alleged that when he did not heal properly after the surgery, Lawton was negligent in failing to treat the postoperative problems.

After the district court concluded Williams' standard of care witness qualified as an expert under K.S.A. 60-3412, Philip Diggdon, M.D., testified he had completed thousands of such surgeries, including hundreds on adults, and that Williams should have been checked for diabetes before surgery. Diggdon explained that diabetes left uncontrolled in any surgical patient "is fraught with many, many complications," including fungal infections. Diggdon testified Lawton's failure to check for diabetes before surgery was a departure from the standard of care.

Ultimately, the jury found Lawton 54% at fault for Williams' injuries and Williams 46% at fault. The jury awarded $200,000 for past and present pain and suffering and $1,775,000 for future pain and suffering. The jury was polled, and each juror confirmed the verdict was that of 10 or more jurors.

Lawton then filed a motion for the cap on damages be applied to the verdict, a motion for judgment not withstanding the verdict, and a motion to reconsider the decision qualifying Diggdon as an expert. Lawton also filed a motion for new trial based upon the expert witness issue, juror misconduct, and attorney misconduct. The motion was supported with the affidavit of a juror, which counsel procured after a postverdict systematic telephone poll of all jurors. The affidavit stated, among other complaints, that "the verdict was reached by averaging all of the jurors' opinions." Based on this affidavit, the district court acted *sua sponte* in recalling all the jurors for postverdict interviews. Eight of the 12 jurors appeared for the questioning and separately testified in response to

the court's questions; counsel were not permitted to directly participate in the questioning. The scope and result of these juror interviews will be discussed below.

The district court ultimately granted Lawton's motion for a new trial based on juror misconduct having "substantially prejudiced" Lawton's rights. A new trial was scheduled for November 7, 2006, but the court granted the parties' request to seek an interlocutory appeal on three issues only: (i) the court's admission of Diggdon's expert testimony; (ii) the court's authority to recall the jury *sua sponte*; and (iii) the court's decision to question the jurors itself, without permitting direct participation by counsel during the recall. This court granted the defendant's interlocutory appeal on September 7, 2006. A subsequent order granted the plaintiff's cross-appeal. Timely docketing followed.

### What is the Proper Scope of this Interlocutory Appeal?

The three questions certified by the district court were appealed respectively by the party aggrieved by each; *i.e.*, Lawton appealed the court's decision to permit the plaintiff's expert to testify, and Williams appealed the court's decisions in connection with the jury recall. Lawton argues, however, that Williams has attempted to expand the scope of the appeal by raising other issues related to the order for new trial and seeking a reinstatement of the jury verdict. Accordingly, Lawton suggests that the order granting a new trial was not itself appealed or appealable and that this court should refrain from addressing any issues beyond the specific questions certified. We disagree.

First, we note that addressing the specific certified questions related to jury recall without considering whether a new trial was warranted would require us to issue a mere advisory opinion, which would be prohibited. See *Cady v. Cady*, 224 Kan. 339, 345, 581 P.2d 358 (1978) (courts do not render advisory opinions on abstract questions of law absent actual controversy). Surely the district court had no such naive expectation in certifying the questions related to the jury recall; it seems far more logical that the district court believed there was legitimate room for difference of opinion on the entire procedure employed for the jury recall and questioning,

and the court expected us to review the key questions of law and determine whether jury recall and its outcome adequately supported the order for a new trial. In fact, the district judge clearly expressed his understanding of the scope of this appeal by stating, "And it's my understanding if I make interlocutory findings, that what goes up is the whole motion for new trial and not just whatever issue I say goes up."

Second, our Supreme Court has recognized that the proper scope of an interlocutory appeal is not necessarily restricted to the specific certified questions. In *Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, Syl. ¶ 2, 997 P.2d 681 (2000), the court held: "Where an appealable issue in an interlocutory appeal is inextricably intertwined with other issues that do not themselves meet the criteria for an interlocutory appeal, the latter issues may also be reviewed to allow meaningful review and promote judicial economy." In so holding, the court considered federal authority, specifically *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1365 (11th Cir. 1997). It appears the federal courts are consistent on this principle of pendant interlocutory jurisdiction.

The federal courts recognize the permissible scope of an interlocutory appeal is not limited to the precise questions that may have been certified by the district court, but rather the appeal should be limited to the order or orders implicated by the certified questions. See, *e.g.*, *Paper, Allied-Industrial v. Continental*, 428 F.3d 1285 (10th Cir. 2005) (appellate court can and should address a different legal question if it controls the disposition of the order from which the certified questions were taken); *J.S. ex rel. N.S. v. Attica Cent. Schools*, 386 F.3d 107 (2d Cir. 2004), *cert. denied* 544 U.S. 968 (2005) (appeal is not necessarily limited to certified issue, and the court has discretion to consider any aspect of the order from which appeal was taken); *McFarlin v. Conseco Services, LLC*, 381 F.3d 1251 (11th Cir. 2004) (appellate jurisdiction is not tied to the particular questions formulated by the district court but rather applies to the order certified); *Dailey v. National Hockey League*, 987 F.2d 172 (3d Cir.), *cert. denied* 510 U.S. 816 (1993) (review in interlocutory appeal is not constrained by question certified but may address any issue necessary to decide the appeal);

*Pinney Dock and Transport Co. v. Penn Cent. Corp*, 838 F.2d 1445 (6th Cir. 1988), *cert. denied* 488 U.S. 880 (1988) (issues not properly certified for interlocutory appeal are subject to discretionary power of review if otherwise necessary to the disposition of the case); *Ducre v. Executive Officers of Halter Marine, Inc.*, 752 F.2d 976 (5th Cir. 1985) (district court articulation of certified issues of interlocutory appeal in effect certified entire order for review); *In re Oil Spill by Amoco Cadiz, Etc.*, 659 F.2d 789 (7th Cir. 1981) (appellate court free to consider such questions as are basic to and underlie the orders supporting the appeal).

Our discussion of the permissible scope of an interlocutory appeal should not be misunderstood. We adhere to the long-standing policy in Kansas to discourage interlocutory appeals and avoid piecemeal and fractionalized litigation. See *McCain v. McCain*, 219 Kan. 780, 783, 549 P.2d 896 (1975). Notwithstanding certification of an interlocutory appeal by a district court, granting permission for such an appeal is solely within our sound discretion. K.S.A. 60-2102(c). Generally, an order granting a new trial would not be subject to interlocutory review. See *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 485, 15 P.3d 338 (2000). Our review of such an order in this case should be viewed as one of the narrow exceptions to the rule and solely due to our conclusion as to pendant interlocutory jurisdiction. See *Noel v. Pizza Management, Inc.*, 258 Kan. 3, 15-18, 899 P.2d 1013 (1995).

We conclude that all three of the certified questions were derived from and were the lynchpins for the district court's order granting a new trial to Lawton. Just as contemplated by the district court, we have no difficulty in reviewing that order in its entirety as within the proper scope of this interlocutory appeal.

### Did the District Court Err in Finding Plaintiff's Expert Witness Was Qualified to Testify Under K.S.A. 60-3412?

As to the first certified question and subject of Lawton's appeal, Lawton contends Williams' expert, Dr. Diggdon, did not meet the criteria set forth in K.S.A. 60-3412 and, thus, the district court erred in admitting his testimony and in rejecting this as a basis for

a new trial. Williams argues the district court did not misinterpret the statute and applied it correctly. The amicus brief of the Kansas Association of Defense Counsel supports Lawton's position.

The interpretation of a statute is a question of law over which an appellate court has unlimited review. *Cooper v. Werholtz,* 277 Kan. 250, 252, 83 P.3d 1212 (2004).

K.S.A. 60-3412 provides:

"In any medical malpractice liability action, as defined in K.S.A. 60-3401 and amendments thereto, in which the standard of care given by a practitioner of the healing arts is at issue, no person shall qualify as an expert witness on such issue unless at least 50% of such person's professional time within the two-year period preceding the incident giving rise to the action is devoted to actual clinical practice in the same profession in which the defendant is licensed."

Williams' surgery was performed on February 1, 2002; Williams first saw Lawton on January 24, 2002. The district court concluded the incident, under the statute, occurred February 1, 2002.

Diggdon testified as to the following:
- Diggdon was 74 years old when he testified.
- When he practiced full-time, he saw up to 100 patients per week.
- He was a board certified urologist since 1968, having been a physician since 1958, and had performed thousands of surgeries like that performed on Williams, including "probably in the hundreds, high hundreds" on adults.
- Between January 24, 2000 and October 31, 2001, he saw patients in his office or a clinic.
- In February 2000, he worked Mondays, Tuesdays, and half-days on Wednesdays, Thursdays, and Fridays.
- In October of 2001, he saw six to eight patients per week.
- His income for the 2 years between January 2000 and January 2002 was approximately $130,000 gross annually, with approximately 10% being for consultations on legal matters/cases.
- He retired from his clinical practice entirely on October 31, 2001, approximately 4 months prior to Williams' circumcision.
- He testified as an expert in other cases prior to this case. He forensically reviewed approximately 28 cases over a 2-year period prior to this trial.

The district court concluded Diggdon qualified as an expert under K.S.A. 60-3412 and provided this explanation in its memorandum opinion:

"From January 1, 1997 to October 31, 2001, Dr. Diggdon was engaged in clinical practice, seeing patients in his office. During this time period, Diggdon'[s] office was open all day on Mondays, and four hours per day on Tuesdays, Wednesdays, Thursdays, and Fridays. Diggdon testified, in trial or at deposition, that by February 2000, he was seeing approximately 6 to 12 patients per day. Importantly, Diggdon testified that the drop in patients was due to the fact patients stopped coming. He said that the drop in patients was not due to any desire to see fewer patients.

"Dr. Diggdon testified at trial that if one totaled all the hours he spent in clinical practice seeing patients in the office in the two years before February 1, 2002, even counting the months of no clinical patients form October 31, 2002 to February 1, 2002, he spent more than 50 percent of his time in actual clinical practice. In addition, Diggdon testified that more than fifty percent of his total income during that same two-year period came from actual clinical practice."

Lawton's argument is that Diggdon was not qualified because he had no clinical practice and practiced 100 percent as an expert witness for the 3 months preceding this incident and Diggdon was seeing patients only part-time for the remainder of the 2 years preceding October 31, 2002. Lawton argues that the statute requires that a physician witness be a full-time professional throughout the 2-year period *and* devote 50% of his or her time to clinical practice.

The statute clearly instructs the district court to look at the entire 2 years preceding the occurrence and determine if at least 50% of the witness' professional time was spent on clinical practice. The record supports the district court's finding that Diggdon did spend at least 50% of his professional time during the 2 years preceding the incident on his clinical practice, notwithstanding the fact of his retirement approximately 4 months immediately prior to the incident and his full-time consulting thereafter.

Lawton relies heavily on legislative history. We have examined Lawton's argument carefully, and we are sensitive to the legislative history cited that would suggest that "hired guns" or "professional witnesses" who do not maintain a clinical practice may not have been intended to meet the eligibility standards of the statute. See

*Endorf v. Bohlender*, 26 Kan. App. 2d 855, 864, 995 P.2d 896, *rev. denied* 269 Kan. 932 (2000). Before consulting legislative history, however, we examine the statutory language to see if it is capable of more than one meaning. See *Gehring v. State Dept. of Transportation*, 20 Kan. App. 2d 246, 248, 886 P.2d 370 (1994), *rev. denied* 256 Kan. 994 (1995). Generally, courts employ a presumption that the legislature expressed its intent through the plain language employed within the statute. *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. 603, 618, 132 P.3d 870 (2006). Where the legislature has unambiguously determined the size of the mesh in the net, the fact that unintended varieties of fish may pass through that mesh has little bearing on anything. See *Colorado Interstate Gas Co. v. Board of Morton County Comm'rs*, 247 Kan. 654, 662, 802 P.2d 584 (1990).

The fact is that there is no requirement within the express language of K.S.A. 60-3412 that the proposed expert witness devote any specific amount or percentage of his or her time to the professional practice of the healing arts at issue. The clear thrust of the statutory language is that at least 50% of "such person's professional time within the two-year period" must be "devoted to actual clinical practice." If the legislature had desired to require as a second criterion that the proposed witness "have a full-time professional practice" or "be at all times within the period a full-time professional" or "devote at least [a certain] % of time to a professional practice," any such language could easily have been employed to achieve the result argued by Lawton. No such language appears in the statute, and we decline to judicially graft language onto the statute that is simply not there. We do not add something to statutory language that is clearly not present in the statute. See *State v. Alires*, 21 Kan. App. 2d 139, Syl. ¶ 2, 895 P.2d 1267 (1995).

We conclude that the district court did not err in its interpretation and application of K.S.A. 60-3412. Diggdon properly testified on behalf of plaintiffs, and his testimony properly played no role in determining whether Lawton was entitled to a new trial.

### Did the District Court Err
### in the Decision to Recall the Jury
### and the Procedure Utilized in
### Questioning the Jury Upon Recall?

On cross-appeal, Williams challenges the district court's *sua sponte* decision to recall the jury, arguing that the recall procedure utilized was improper absent motion of a party, untimely, failed to include participation of counsel, invaded the mental processes of the jury, and failed to show sufficient misconduct to support the court's order granting a new trial.

Our standard of review is multifaceted. To the extent we are required to interpret a statute, appellate review is unlimited. *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3d 1149 (2000). To the extent we examine the district court's decision to order a new trial, we review for an abuse of discretion. *Sterba v. Jay*, 249 Kan. 270, 274, 816 P.2d 379 (1991). Judicial discretion must be exercised in accordance with established principles of law. *Saucedo v. Winger*, 252 Kan. 718, 731, 850 P.2d 908 (1993).

### General Rules for Jury Recall in Kansas

We begin with an overview of relevant policy, statutes, rules, and procedures or practices governing the recall of a jury. The right to trial by jury is protected by the Kansas Constitution Bill of Rights, § 5. This right is a substantial and valuable right, and it must be carefully guarded against infringement. *Waggener v. Seever Systems, Inc.*, 233 Kan. 517, 520, 664 P.2d 813 (1983). As noted by the federal rules advisory committee, the original common-law rule prohibiting impeachment of a verdict was based on sound policy rationale: (i) it discouraged tampering with the jury and harassment or annoyance of jurors; (ii) it protected the privacy and secrecy of jury deliberations; and (iii) it furthered a strong policy of finality of decisions by upholding verdicts. Concannon, *Impeaching Civil Verdicts: Juror Statements as Prejudicial Misconduct*, 52 J.K.B.A. 201 (Fall 1983). Public policy forbids the questioning of a juror on the mental processes used in reaching a verdict since "there is no possible way to test the truth or veracity of the answers." *Kincaid v. Wade*, 196 Kan. 174, 178, 410 P.2d 333 (1966), as quoted in

*State v. Franklin,* 264 Kan. 496, 499, 958 P.2d 611 (1998). Our Supreme Court has summarized these policy considerations as follows:

"It is a long established and generally accepted doctrine that testimony or affidavits of jurors impeaching their verdict will not be received where it is not evident that the jury had acted in contravention of the court's instructions and of the evidence. This protection is to insure that the mental process of a juror in reaching a verdict or the factors which influenced the mental process cannot be inquired into for the purpose of impeaching a verdict. The right to inquire into the jury's basis for reaching a verdict would open the door to the most severely harmful methods for tampering with jurors and would allow a dissatisfied or corrupted juror to destroy a verdict to which that juror had given his assent under sanction of the juror's oath. Jurors are to be afforded the right to have private, frank and free discussions of the questions under consideration." *City of Ottawa v. Heathman,* 236 Kan. 417, 420, 690 P.2d 1375 (1984).

Kansas recognized a limited need to permit juror testimony in the enactment of two statutes, today embodied in K.S.A. 60-441 and K.S.A. 60-444(a). These statutes provide:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined." K.S.A. 60-441.

"This article shall not be construed to (a) exempt a juror from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441." K.S.A. 60-444(a).

Appellate courts since the early 1980's have struggled with the inherent tension between guarding the integrity and finality of jury verdicts and protecting a party from juror misconduct. The contours of the statutes have best been defined in the following cases: Where the jury is polled and each juror acknowledges that the verdict is his or her verdict, this consideration must be weighed against a later challenge to the verdict. *Franklin,* 264 Kan. at 505; see *State v. Kaiser,* 260 Kan. 235, 250-52, 918 P.2d 629 (1996). The "proper course" or better practice is to seek permission of the court to interview jurors after a verdict. See *State v. McDonald,* 222 Kan. 494, 496-97, 565 P.2d 267 (1977). Affidavits of counsel

need not be considered in determining whether juror misconduct has occurred. *Butler v. HCA Health Svcs. of Kansas, Inc.*, 27 Kan. App. 2d 403, 408, 6 P.3d 871, *rev. denied* 268 Kan. 885 (1999). Evidence suggesting misconduct must be sufficiently detailed to demonstrate just what the jurors did to determine whether their actions could constitute misconduct. See *Cornejo v. Probst*, 6 Kan. App. 2d 529, 537, 630 P.2d 1202, *rev. denied* 230 Kan. 817 (1981).

Supreme Court Rule 169 (2006 Kan. Ct. R. Annot. 221) mandates the trial judge give the following instruction to the jury prior to discharge:

> "You have now completed your duties as jurors in this case and are discharged with the thanks of the court. The question may arise whether you may discuss this case with the lawyers who presented it to you. For your guidance the court instructs you that whether you talk to anyone is entirely your own decision. It is proper for the attorneys to discuss the case with you and you may talk with them, but you need not. *If you talk to them you may tell them as much or as little as you like about your deliberations of the facts that influenced your decision.* If an attorney persists in discussing the case over your objections, or becomes critical of your service either before or after any discussion has begun, please report it to me." (Emphasis added.)

This Rule and its mandatory instruction seems to contemplate an open exchange of information between *willing* jurors and counsel, but the statutory restrictions on formal use of such information demonstrates that any such exchange is primarily intended for the educational benefit of counsel and not for the purpose of "fishing" for grounds to impeach the verdict. See *State v. Blocker*, 211 Kan. 185, 196, 505 P.2d 1099 (1973) (K.S.A. 60-444 "not intended to authorize broad hunting expeditions or fishing excursions.").

The posttrial calling of jurors for testimony is governed by Supreme Court Rule 181 (2006 Kan. Ct. R. Annot. 227), which provides:

> "Jurors shall not be called for hearings on post-trial motions without an order of the court after motion and hearing held to determine whether all or any of the jurors should be called. If jurors are called, informal means other than subpoena should be utilized if possible."

Our Supreme Court has explained the importance of this rule in *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

"Jurors may be recalled for post-trial hearings only by order of the court after a hearing on a request to recall the jury. A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking a order to recall the jurors to show the necessity for the order. [Citation omitted.]"

Our extensive review of cases addressing allegations of jury misconduct demonstrates that the burden to support a jury recall, as well as the burden in demonstrating jury misconduct, are indeed heavy ones. Our courts have consistently held that remarks by one or more jurors about outside matters do not vitiate the verdict absent an affirmative showing the remarks prejudicially affected the verdict. See the cases cited in *Butler*, 27 Kan. App. 2d at 411-12. A verdict may not be impeached by questions concerning a juror's views or conclusions, the reasons for those views, the factors used in determining those conclusions, what influences those views, or the mental processes utilized in reaching those conclusions in the matter. *Saucedo v. Winger*, 252 Kan. 718, 728-29, 850 P.2d 908 (1992). A juror may not impeach his or her verdict on any ground inherent in the verdict itself or divulge what considerations influenced him or her in arriving at the verdict; inquiry may be made into the extrinsic matters of physical facts, conditions, or occurrences of juror misconduct, either within or without the jury room, which were material to the issues being determined. *Franklin*, 264 Kan. at 503-04. A new trial is to be granted only if required in the interest of justice. See K.S.A. 60-259; K.S.A. 22-3501(1); *Franklin*, 264 Kan. at 502, (quoting *Kaiser*, 260 Kan. at 250). Juror misconduct is not grounds for a new trial unless it is shown to have substantially prejudiced a party's rights. *State v. Goseland*, 256 Kan. 729, 735, 887 P.2d 1109 (1994); see K.S.A. 60-259(a). Examining appellate cases over the past 25 years, it is clear that a jury recall is generally to be discouraged.

Jury recall issues have most often been discussed in the context of a quotient verdict. A quotient verdict is one in which the jurors agree in advance to return as their verdict the amount obtained by

averaging the figures each juror records as his of her verdict and subsequently return a verdict that is the direct product of such an agreement. Such a verdict is frequently called a "gambling verdict" because at the time the advance agreement is made no juror can possibly know the ultimate figure to which he or she has been committed. *Foster v. City of Augusta*, 174 Kan. 324, 331, 256 P.2d 121 (1953). With respect to allegations of juror misconduct due to a quotient verdict, an affidavit may not be used to impeach the verdict unless it establishes that the jury entered into a conscious conspiracy to circumvent the deliberation process by engaging in conduct which produces a quotient verdict. See, *e.g., Jones v. Sigg*, 261 Kan. 614, 621-22, 930 P.2d 1077 (1997); *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, 478-79, 856 P.2d 906 (1993). Mere allegations of "averaging" do not establish an impermissible quotient verdict. See *Blevins v. Weingart Truck & Tractor Service*, 186 Kan. 258, 263-65, 349 P.2d 896 (1960).

"The impropriety of a 'quotient' verdict, and the situation which the law abhors, consists not in the method or the result but in the advance agreement of the jurors to be bound by the quotient so determined, and then return the quotient as a verdict without further suitable deliberation. . . . If, however, there is no antecedent agreement between the jurors, or commitment to be bound by the quotient so found, resort to the averaging process is entirely permissible. The jurors are as much entitled to strike a quotient to see what their average thinking is, to serve as a working basis, as they are to let each juror give his suggested verdict orally and permit some member of the jury to strike a rough quotient by mental arithmetic. So long as there is opportunity for full discussion and deliberation concerning the question of damages, and so long as each juror gives his own independent agreement to the sum arrived at, after he knows what the sum is, there is no misconduct and no ground for a new trial." 186 Kan. at 264.

Our appellate courts have refused to conclude that a quotient process should impeach the jury verdict in numerous cases. See, *e.g., Jones*, 261 Kan. at 618-23 (affidavits insufficient); *Cott*, 253 Kan. at 478-79 (affidavits inadmissible); *Siruta v. Hesston Corp.*, 232 Kan. 654, 669, 659 P.2d 799 (1983) (affidavits insufficient); *Merando v. A.T. & S.F. Rly. Co.*, 232 Kan. 404, 407-10, 656 P.2d 154 (1982) (affidavits inadmissible); *Hogue v. Kansas Power & Light Co.*, 212 Kan. 339, 344-46, 510 P.2d 1308 (1973) (juror testimony inadmissible); *Blevins*, 186 Kan. at 263-65 (juror testimony

insufficient). Our courts have upheld a new trial on a showing of jury misconduct related to a quotient verdict in *City of Ottawa*, 236 Kan. 417, and *Verren v. City of Pittsburg*, 227 Kan. 259, 607 P.2d 36 (1980).

### Analysis of the Jury Recall by the District Court

Applying these principles to the facts before us, we are compelled to conclude that the district court abused its discretion in granting a new trial to the extent the decision was based on jury misconduct. The abuse of discretion is inherent in the following actions of the court:

*Systematic juror by juror contact by counsel should not be undertaken without consent of court.* As noted above, open exchange between willing jurors and counsel is permitted by the instruction required by Rule 169. Yet, case law also recognizes that the better procedure or practice is to seek permission of the court to interview jurors after a verdict. See *McDonald*, 222 Kan. at 496-97. Use of juror testimony to impeach a verdict is unquestionably to be discouraged. See K.S.A. 60-444; *Ruebke*, 240 Kan. at 513. Construing these mandates in an effort to harmonize their apparent competing intentions and policy safeguards, we hold that the better practice dictates that the systematic contact of the entire jury, juror by juror, with the clear intention of exploring grounds to impeach the verdict be undertaken only with the knowledge and consent of the court. Moreover, where an affidavit results from such an effort without approval of the court, the affidavit should be viewed with a healthy amount of circumspection. Where, as here, the verdict itself has no obvious impeachable qualities, the jury was polled and endorsed the verdict, there has been no reported juror misconduct, there has been no consent of the court to juror contact, the contact is initiated by counsel rather than a juror, and the affidavit results from a systematic attempt to contact all jurors by counsel with an obvious intent to challenge the verdict, the court must be cautious in considering and in giving credence to the affidavit. In the absence of significant corroboration of the averments in such an affidavit, recall of the jury must be discouraged.

*Failure to seek corroboration prior to jury recall.* Because jury recall should be avoided without strong suspicion of misconduct, we believe a single juror's affidavit procured under these circumstances should be subject to further inquiry prior to any recall of further jurors. This could have been achieved here by having the single averring juror appear for such an inquiry before proceeding with any further jury recall. Because no such corroboration was achieved, recall was not warranted based solely on the affidavit.

*Sua sponte recall is contrary to Supreme Court Rule.* Rule 181 (2006 Kan. Ct. R. Annot. 227) clearly prohibits jurors being called for hearings on posttrial motions without a court order *"after motion and hearing"* to determine whether any jurors should be recalled. We believe this rule is intended to protect the integrity and finality of the verdict from precipitative action of the court. As noted by the dissent, the district judge stated that he was addressing the matter *sua sponte,* but counsel apparently viewed this as an invitation for a motion and accommodated the court with an oral motion. If not expressly violated, Rule 181 was violated in spirit.

*The questioning of jurors by the court was not an abuse of discretion, but it may have invaded the mental processes of the jury.* Williams cites no authority and we are not aware of any in Kansas addressing the proper technique for questioning jurors in a recall, beyond the general rule that the mental processes of the jury not be invaded. Here, the district court decided to conduct the questioning itself without direct participation of counsel. We decline to hold that this approach to juror questioning was itself an abuse of discretion. Our examination of the questioning, however, causes us to conclude that the questioning by the court may have invaded the mental processes of the jury. In fact, the district judge commented he believed that "mental impressions are part of the quotient verdict issue" and "I can't stay away from it completely." Indeed, the court often asked questions such as: "[W]hy did you . . . ?"; "[D]id you believe that you still had the ability to disagree?"; "[W]ould that mean that when [the jurors] put their numbers down, some [jurors] didn't understand . . .?"; "[D]id you believe that the second time was going to still be a run-through, at

which time you could still discuss and dissent or did you believe that that was going to be the number of the jury?"; and "[W]hy [did some jurors] disagree with the number?" Such questioning probes the thought processes of the jurors and is prohibited by our case law.

*Juror testimony insufficient to show quotient verdict.* Although whether a verdict was a quotient verdict is a fact-based inquiry (*Foster*, 174 Kan. at 331) here, we are able to apply well-established legal principles to the undisputed evidence and the findings of the district court without reweighing the testimony of individual jurors. Focusing on the issue of whether there was an opportunity for discussion and deliberation on the question of damages, we conclude that the collective testimony of the jurors did not support jury misconduct. Although the district court found that "some" of the jurors "believed that they were agreeing, in advance" to be bound to a *second* process of averaging comparative fault percentages, others "believed the average was a starting point for discussion." Where jurors are not in *complete* agreement in advance to be bound by a quotient verdict and there is no collective understanding as to the effect of averaging, there simply is no "conscious conspiracy" to disregard and circumvent the instructions on the law given by the court.

Moreover, the jurors who were asked unanimously agreed that at least two if not more averages were sequentially discussed and considered; this approach defies the impermissible aspects of a quotient verdict. So long as averaging is merely a tool for discussion and not an exclusive and preordained formula, the result is not prohibited. Most importantly, the jurors who were asked unanimously stated that after the final averaging, the jurors voted on the result before returning the verdict. The collective testimony simply does not support a quotient verdict. Consider, for example, this testimony of Juror B.B.:

"THE COURT: So when you—when you decided to take the average—or decided on the procedure of the average, did you all decide ahead of time before you did the average that that was going to be the verdict of the jury?

"Juror [B.B.]: I don't think it was really stated that, but I mean I—I assume so.

"THE COURT: After you took—or arrived at the second number but before you took the vote, did you believe that you still had the ability to disagree with the—

"Juror [B.B]: sure.

"THE COURT: — number?

"Juror [B.B.]: Sure.

"THE COURT: Okay. And so you—what you're telling me is the—the jury wasn't going to be bound by that average number without discussion?

"Juror [B.B.]: No, and actually we went around and asked, do you agree, does everybody agree, does anybody not agree. And I believe everyone agreed.

"THE COURT: After the discussion? But they agreed on the procedure would be that you still had the ability to discuss the number after the second average came out?

"Juror [B.B.]: Right."

Juror B.B.'s testimony was not unique; in fact, all but one juror who testified indicated that there was *some* discussion after the second vote was taken. Although the dissent notes a lack of unanimity among jurors in *City of Ottawa*, other factors clearly required a new trial there, including a disregard for the court's instructions and a lack of discussion after an improper approach to determining damages. 236 Kan. at 425-26.

When the totality of these circumstances are considered, the district court abused its discretion in ordering and conducting the jury recall and erred in determining there was juror misconduct as a result of the recall. We are most offended by the systematic contact of jurors after the verdict in an attempt to impugn the integrity of the verdict. Whether this technically qualifies as a "fishing expedition," this approach resulted in tampering with the jurors in an attempt to destroy the verdict. When the verdict is not itself inherently suspicious and there is no misconduct reported by jurors, counsel must not invade the sanctity of the jury process in the hope of discovering such misconduct. If we were to endorse the conduct of defense counsel in this case, we believe it would indeed "open the door to the most severely harmful methods for tampering with jurors" and no verdict would be safe from the ravages of counsel for the losing party. See *City of Ottawa*, 236 Kan. at 420.

We share the concern of the United States Supreme Court, which rejected a verdict challenge stating:

"[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *McDonald v. Pless*, 238 U.S. 264, 267-68, 59 L. Ed. 1300, 35 S. Ct. 783 (1915).

Although the district court was not a part of this conduct, it became a participant when it failed to consider the polling of the jury after the verdict, considered the singular juror affidavit absent further corroboration, and then *sua sponte* ordered the jury recall. Although allegations of juror misconduct may properly provoke judicial action, the circumstances here were insufficient to set aside the jury's verdict and to order a new trial.

To the extent that jury misconduct was the lynchpin of the court's order granting a new trial, that order must be reversed. We acknowledge that the district court discussed additional grounds in support of a new trial in the order granting a new trial, but the court specifically found that "the evidence of jury misconduct regarding insurance, attorney fees, and the extrapolated verdict is not enough to independently warrant a finding of substantial prejudice to the rights of Lawton to a fair and impartial trial." Similarly, the court found that allegations of attorney misconduct "did not approach the level of conduct . . . that would warrant a finding of substantial prejudice." For these reasons, we conclude our reversal of the district court's conclusion of jury misconduct clearly warrants the reversal of the court's order for a new trial. Accordingly, we reverse and remand with directions to reinstate the verdict of the jury.

In summary, we have addressed and answered the certified questions as follows: (i) The district court did not err in its interpretation and application of K.S.A. 60-3412 in permitting Williams' expert to testify; (ii) the district court erred in ordering a jury recall absent any motion of a party; and (iii) the district court did not

abuse its discretion in questioning jurors without direct participation of counsel. Because our analysis has undermined the principal basis for the district court's order of a new trial, we reverse that order and remand with directions to reinstate the verdict of the jury.

Reversed and remanded with directions.

LARSON, J., concurring in part and dissenting in part: I agree with several of the conclusions reached by the majority, but I am in fundamental disagreement with the ultimate result reached by the majority and respectfully dissent therefrom.

My first choice would be, for the reasons hereafter stated, to hold the district court improperly certified the issues for an interlocutory appeal, our court should have denied permission for consideration of the interlocutory appeal, and we should hold that such permission was improvidently granted. See *City of Manhattan v. Eriksen*, 204 Kan. 150, 155, 460 P.2d 622 (1969).

The language of K.S.A. 60-2102(c) allows an interlocutory appeal to be considered "[w]hen a district judge . . . is of the opinion that such order involves a controlling question of law . . . and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." By allowing the interlocutory appeal, we have not materially advanced the ultimate termination of this litigation, but only delayed the time which it is taking for Richard Williams to receive the judgment to which he may well be entitled.

The record below reflects that a motion was filed in the district court by Williams to declare K.S.A. 60-19a02 unconstitutional and for an evidentiary hearing on the question. And, a motion was filed by Dr. Steve Lawton to apply the provisions of K.S.A. 60-19a02 to the jury's award and reduce Williams' noneconomic damages to the sum of $250,000.

These questions have not been resolved by the district court, since a new trial was ordered. But, if the majority opinion herein becomes the law of this case, the questions regarding K.S.A. 60-19a02 remain to be resolved upon remand to the district court.

An appeal from the result of the determination of the damages cap issue is certainly not guaranteed. But if this issue is resolved adversely to Williams, his judgment will be reduced from $1,066,500 to $250,000, resulting in a decrease of $816,500 and making an additional appeal a distinct possibility.

In addition, upon remand, arguments of trial error remain which may be made by Lawton that are appealable as a matter of right.

By granting the interlocutory appeal in this case, we have set up the possibility of piecemeal appeals which have not been approved since we adopted the "new" Code of Civil Procedure, K.S.A. 60-101 *et seq.*, in 1963. In an early opinion which involved a pretrial order being held to not be appealable, our Supreme Court stated in *Connell v. State Highway Commission*, 192 Kan. 371, 374, 388 P.2d 637 (1964): "The policy of the new code leaves no place for intermediate and piecemeal appeals which tend to extend and prolong litigation. Its purpose is to secure the just, speedy, and inexpensive determination of every action."

I recognize that a valid argument can be made that by resolving the issues presented, no further appeals will be taken in this case, but a reading of the record in this hard-fought case indicates such is not likely. The interlocutory appeal should not have been allowed by the district court, and our court should not have granted permission for it to be taken. I would hold this appeal was improvidently granted and order it to be dismissed.

However, since a majority of this panel has held otherwise, I am required to further state my agreement in part and my dissent in part to the result reached by the majority herein.

If we consider this interlocutory appeal, the first issue is the extent and scope of the appeal. This was an issue upon which there were several hearings in district court, resulting in an order granting permission for the parties to seek an interlocutory appeal on the following three issues: "(a) The admission of Dr. Diggdon's expert testimony; (b) the court's authority to recall the jury; and (c) the questioning of the recalled jurors by the court, but not by counsel for the parties."

During a telephonic conference with the district court on July 20, 2006, concerning the language of the journal entry on the re-

quests for permission to take an interlocutory appeal, counsel for Williams requested the court to certify an additional issue as to whether there was a quotient verdict rendered in this case.

The district judge specifically denied Williams' request by stating he believed this to be a mixed issue of law and fact and then said, "And if it is a mixed issue of law and fact, it is not something for which I can make the interlocutory findings."

While there is a real question as to the scope of review of an order granting a new trial because of improper jury actions, it is difficult to say since K.S.A. 60-2102(c) requires that "such order involves a controlling *question of law* upon which there is a substantial ground for difference of opinion." (Emphasis added.)

It would be my preference to simply hold the granting of a new trial may not be the subject of an interlocutory appeal, but we are bound by the language of *Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, Syl. ¶ 2, 997 P.2d 681 (2000), which said: "Where an appealable issue in an interlocutory appeal is inextricably intertwined with other issues that do not themselves meet the criteria for an interlocutory appeal, the latter issues may also be reviewed to allow meaningful review and promote judicial economy."

It is logical that when the issue of the expert witness testimony under K.S.A. 60-3412 was certified for an interlocutory appeal, the authority for jury recall and the questioning of the jurors became inextricably intertwined with the additional issue of whether a new trial should have been granted. While I am uneasy with the precedent we are setting in this case of expanding the scope of an interlocutory appeal beyond that of the language certified, there are reasons to do so which are well stated in the majority opinion. I concur with the majority that we should consider all of the issues raised by the district court's ruling as to K.S.A. 60-3412 and its entire ruling in regards to the motion for a new trial.

As to the district court's ruling allowing Williams' expert witness, Dr. Philip Diggdon, to qualify to testify under K.S.A. 60-3412. I agree with the ruling below and the majority that it was proper to allow Diggdon to testify. I understand Lawton's legislative history arguments, but the language of the statute must be our primary

consideration. I concur with the majority on this issue. It would, however, be my preference that this issue be presented only in an appeal from a final judgment, as was the case in *Glassman v. Costello*, 267 Kan. 509, 986 P.2d 1050 (1999).

I next turn to the consideration of the remaining issues relating to the trial court's 28-page memorandum decision on Lawton's motion for judgment as a matter of law and alternative motion for a new trial. The decision denied judgment as a matter of law, which was the K.S.A. 60-3412 question, but granted Lawton's K.S.A. 60-259 motion for a new trial.

My review of the record indicates that after the jury's verdict was accepted, the district judge, following Supreme Court Rule 169 (2006 Kan. Ct. R. Annot. 221), said the following:

"You've now completed your duties as jurors in this case and you're discharged with my thanks. And remember, I previously admonished you to not discuss the case with anyone else. You are now free to discuss the case with anyone with whom you wish to do so. You may wonder about whether or not you need to or have to talk to the attorneys or the parties in this case. You can if you want to, you do not have to if you do not want to. And if they ask to talk to you and you do not want to, just tell them I don't wish to talk to you and they will accept that as your answer and they will not bother you any more."

I see nothing improper with the communications between counsel or representatives of Lawton with members of the jury. The jurors had the right to talk with counsel in the case, as well as the right to refuse to do so. I see no requirement, as our majority would require to procure the consent of the court prior to contact with a juror. A careful reading of the decisions and rationale of the two cases relied upon by the majority, *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842 (1987), and *State v. McDonald*, 222 Kan. 494, 496-97, 565 P.2d 267 (1977), do not require the conclusion that contact with a juror after trial is to be allowed "only with the knowledge and consent of the court," as indicated in the majority opinion. Such a requirement or rule would be an abandonment of long-time practice, severely limit counsel in their search for the truth and integrity of a jury's verdict, and make misconduct of a jury unduly difficult to be discovered and rectified.

In this case, a motion for a new trial was timely filed pursuant to K.S.A. 60-259 and alleged statutory grounds under subsection (a) and, as required by subsection (c), specifically stated the alleged errors or other grounds relied upon. The new trial motion contained as an attachment the affidavit of juror A.S. who stated that the instructions were not read, the jury was dominated by the foreman, the verdict was reached by an average of the jurors' opinions, improper areas of damages were considered, and the award included money to cover the plaintiff's attorney's expenses.

Williams' response to Lawton's motion requesting a new trial countered Lawton's allegations and included the affidavits of jurors B.B. and C.D.

My reading of the hearing on the motion for a new trial, which was held on March 3, 2006, shows the district court asked counsel to address the issue of whether either side was requesting recall. The court said it was being considered *sua sponte*, but counsel for Lawton immediately thereafter, as shown on page 11 of the transcript of the hearing, specifically requested and moved for the jury to be recalled for examination.

I would not hold that Supreme Court Rule 181 (2006 Kan. Ct. R. Annot. 227) was violated. In fact, an examination of the district court's letter to the jury, dated March 7, 2006, would indicate that Rule 181 was followed. The order to recall the jury was a request, not an order to appear. The jury was to be questioned by the court, although the parties were allowed to submit proposed questions. Finally, the attorneys and related parties were ordered to have no further contact with the jurors.

My examination of the hearing where eight of the jurors appeared showed the court was courteous to the jurors and questioned each of them in basically the same manner. The questions included whether they discussed Williams' ability to obtain medical insurance, attorney fees, whether the question of fault was determined by an average, and whether the jury agreed that the number which came out of the final average would be the verdict of the jury. The court's final question related to the determination of the dollar amount of damages.

From my examination of the record, I would hold that as to issues (b) and (c) certified for interlocutory appeal, the court (1) had authority to recall the jury and properly and correctly did so, as statutorily allowed, following Supreme Court Rules, and (2) did not commit reversible error in questioning the recalled jury and not permitting counsel for the parties to directly do so.

After questioning the eight jury members on March 31, 2006, the trial court on June 5, 2006, issued its written decision on Lawton's motion for judgment as a matter of law and alternatively for a new trial.

The trial court in its memorandum decision stated it had followed K.S.A. 60-441, K.S.A. 60-444, and Supreme Court Rule 181. The court further stated it had considered the pleadings, the juror affidavits, the testimony of the jurors, and the testimony from the trial.

The trial court summarized the testimony of the eight jurors who responded to the request of the court. The trial court found Lawton had not met his burden to be granted a new trial on the issue of attorney fees and whether the discussions of health, diabetes, future medical needs, and health insurance justified a new trial.

As to the question of whether the jury reached its decision based upon a quotient verdict, the court held there was no dispute that the jury reached the verdict on fault by the use of averaging. The issue was whether there was an advance agreement to be bound by the average. The trial court then stated:

"The issue is whether each juror gave their own independent agreement to the verdict. Given that some of the jurors believed in advance that they would be bound by the quotient, the court finds that not all the jurors gave their own independent agreement to the verdict after the second total, even though they were given an opportunity to say whether they disagreed with the tally. The court bases this finding after having closely looked at and listened to each juror as they testified.

"Accordingly, because the court has found that some of the jurors believed they had agreed before taking the average that the average would be the verdict of the jury, because the court has found that there was not an opportunity for full discussion and deliberation of the second total and because the court has found that not all the jurors gave their own independent agreement to the second tally, the court finds the jury's verdict on the issue of percentage fault was an improper quotient verdict."

The trial court further considered the claim by Lawton that prejudice existed because Williams contended he suffered $1,000,000 in future noneconomic damages, yet the jury awarded him $1,775,000 for future noneconomic damages which showed that the jury awarded damages beyond the evidence. After a brief discussion, the court held:

"The problem in this case is that, on the one hand, the jury almost doubled the amount requested in the jury instructions for the special verdict on pain and suffering. On the other hand, the total amount was still within the total damages requested by [sic] the jury. Given the other problems of jury misconduct in this case, the court concludes the verdict was given under the influence of passion or prejudice."

The trial court fully discussed claims of attorney misconduct in the case, concluded with a summary captioned "Cumulative Effect Of All Alleged Errors," and in its concluding ruling finally stated:

"The court has already found Lawton was substantially prejudiced by the quotient verdict. In addition, the court has already found Lawton was substantially prejudiced by the cumulative effect of the jury's discussion of the quotient verdict, attorney fees, future medical problems and extrapolated verdict and the cumulative effect is sufficient to [prove] Lawton's rights to fair and impartial trial were substantially prejudiced.

"With regard to the attorney misconduct, the chief difficulty is the lack of objections or, if there was an objection, the lack of a request for relief at the time. Independently, when the court considers just the attorney conduct that the court found to be prejudicial, the court finds the cumulative effect did not so permeate the trial to be sufficient to warrant a finding that Lawton was substantially prejudiced just by the attorney conduct. The evidence of attorney misconduct certainly did not approach the level of conduct in the [*Smith v. Blakey, Administrator*, 213 Kan. 91, 515 P.2d 1062 (1973),] decision that would warrant a finding of substantial prejudice.

"However, the court finds the court may consider the attorney misconduct evidence when it weighs the jury misconduct evidence and add the weight of that evidence to the court's findings on the prejudicial effect of the jury misconduct. In this light, the court finds the cumulative effect of the prejudicial evidence relating to jury misconduct and relating to attorney misconduct warrant this court's finding Lawton's right to a fair and impartial trial was substantially prejudiced.

". . . Therefore, the court grants Lawton's Alternative Motion for New Trial."

The standard of review in cases where a new trial is granted or denied and where a quotient verdict was reached is well stated in *City of Ottawa v. Heathman*, 236 Kan. 417, Syl. ¶ 1, 690 P.2d 1375

(1984), which states: "The granting of a motion for new trial rests in the judicial discretion of the trial court. The order granting or refusing the motion for a new trial will not be reversed by an appellate court unless a clear abuse of discretion is shown."

However, in the recent case of *State v. Edgar*, 281 Kan. 30, 38, 127 P.3d 986 (2006), Justice Luckert opined:

"Judicial discretion will vary depending upon the character of the question presented for determination. Generally, the trial court's decision is protected if reasonable persons could differ upon the propriety of the decision as long as the discretionary decision is made within and takes into account the applicable legal standards. However, an abuse of discretion may be found if the trial court's decision goes outside the framework of or fails to properly consider statutory limitations or legal standards. [Citations omitted.]"

In our case, testimony of jurors as to how the verdict was reached was heard by the trial court. In such a case where a determination was made as to whether an improper quotient verdict was reached, it was said in *Jones v. Sigg*, 261 Kan. 614, 618, 930 P.2d 1077 (1996):

"This court has previously held in *Foster v. City of Augusta*, 174 Kan. 324, 331, 256 P.2d 121 (1953):

'It is a rule of this court that whether a verdict was or was not a quotient verdict is a question of fact for the trial court to determine (*Fitch v. State Highway Comm.*, 137 Kan. 584, 587, 21 P.2d 318; *Claggett v. Phillips Petroleum Co.*, [150 Kan. 191,] 201, 202), and the judgment having been entered and approved by the trial court in the instant case, this court will not disturb the judgment on that account.' "

In addition, since testimony of jurors was received in the hearing of Lawton's motion for a new trial and the trial court below in reaching its decision stated that it based "this finding after having closely looked at and listened to each juror as they testified," we are taught by *Butler v. HCA Health Svcs. of Kansas, Inc.*, 27 Kan. App. 2d 403, 409, 6 P.3d 871, *rev. denied* 268 Kan. 885 (1999), that "[i]t is up to the trial court to determine the credibility of the witnesses in claims of juror misconduct. [Citation omitted.]"

There seems to always be an issue in appeals where an improper quotient verdict is alleged for an argument to be raised as to whether the mental processes by which the verdict was reached

have been impermissibly considered. Such is the case in this appeal. The applicable statutes are K.S.A. 60-441 and K.S.A. 60-444(a), which read as follows:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined." K.S.A. 60-441.

"This article shall not be construed to (a) exempt a juror from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material hearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441." K.S.A. 60-444(a).

We are taught by *Johnson v. Haupt*, 5 Kan. App. 2d 682, Syl. ¶ 6, 623 P.2d 537 (1981), that "[u]pon an allegation that a jury returned a quotient verdict, narrow questions may be directed to the jurors to determine whether they agreed in advance to be bound by an averaging technique." It was also observed in *Butler*, 27 Kan. App. 2d at 409, that "[t]he line of demarcation between when such evidence is proper under K.S.A. 60-444(a) and inadmissible under K.S.A. 60-441, however, is not a bright line. *Verren v. City of Pittsburg*, 227 Kan. 259, 260-61, 607 P.2d 36 (1980)."

The questions which were asked to the jurors by the trial court related to the issues discussed and became specifically directed as to whether there was a prior agreement to be bound by the average which was taken by the jury on the liability issue.

It is not necessary to probe each question asked by the court, but for an example, in questioning juror A.S., the court said, "Prior to your giving the number for the averaging, whether it was the first time or the second time, did the jury agree that the number that came out as the final average would be the verdict of the jury?" The answer was, "Yeah. Yes, sir."

This type of question related to the action taken by the jury and not to the mental processes which were utilized. I would not hold that the mental processes of the jurors were impermissibly questioned. The limitations of K.S.A. 60-441 were not violated.

In reviewing *Johnson*, 5 Kan. App. 2d at 686, the following wording was utilized in describing a quotient verdict and the effect of the polling of the jury:

"A quotient verdict is one in which the jurors agree in advance to return as their verdict the amount obtained by averaging the figures each juror records as his verdict and subsequently return a verdict that is the direct product of such an agreement. Such a procedure subverts the deliberative process and is prohibited in Kansas. *Foster v. City of Augusta,* 174 Kan. 324, 329-30, 256 P.2d 121 (1953). *Moreover, a subsequent polling of the jury does not diminish the harm already caused by the agreement.*" (Emphasis added.)

The emphasized language confirms my basic disagreement with the conclusion of the majority that when a jury has been polled it must be weighed against a later challenge to the verdict. The two cases cited by the majority, *State v. Franklin,* 264 Kan. 498, 505, 958 P.2d 611 (1998), and *State v. Kaiser,* 260 Kan. 235, 251-52, 918 P.2d 629 (1996), both involved the polling of a jury in a criminal case. I would hold, as *Johnson,* 5 Kan. App. 2d at 686, states, that a subsequent polling of a jury does not diminish the harm caused by an agreement to reach an improper quotient verdict.

I do not dispute most of the statements of the majority as to general rules for jury recall in Kansas, except to note that the summary of policy decisions utilized by the majority is found in a case where the recall of the jury was based on an affidavit of one of the jurors, the court questioned the jurors, two of the six jurors testified there had been a prior agreement to be bound by an averaged amount, and the granting of a new trial by the trial court was affirmed on appeal. See *City of Ottawa,* 236 Kan. 417.

To the extent that Williams has argued that the entire jury panel must have agreed to be bound by the average, the *City of Ottawa* case is clear authority to the contrary, as there only two members of a six-member jury testified they were to be bound by the average and four did not; yet our Supreme Court did not deem this to be significant in approving an order for a new trial. In our case there was a clear finding that four of the eight jurors who testified stated positively that they were to be bound by the average number, which is a clear indication that the trial court's findings and rulings in our case should be approved.

Every case involving a quotient verdict is of necessity different factually, and in the *City of Ottawa* case it was evident the jury had completely disregarded the trial court's instructions as to how

the amount of damages in a condemnation case should be determined. See 236 Kan. at 418. The *City of Ottawa* opinion cited various cases, several of which held that a new trial may be ordered when it is evident that a jury has not followed the court's instructions, 236 Kan. at 421, and others where a new trial was denied. 236 Kan. at 422.

However, the *City of Ottawa* opinion ultimately looked to an earlier quotient verdict case, *Verren*, 227 Kan. 259, which discussed the conflict between K.S.A. 60-441 and K.S.A. 60-444(a) and held that for evidence to be admissible, it "must relate to extrinsic misconduct or to physical facts or occurrences within or without the jury room." 227 Kan. at 260. The *City of Ottawa* opinion ultimately held, as I would in our case, that the trial court acted properly when it questioned the jurors. See 236 Kan. at 424-26.

It is clear that at least four of the jurors stated in response to the trial court's questions that the number which came out of the final average would be the verdict of the jury. The question asked and answer given by juror A.S. (when the propriety of the questions was earlier discussed in this dissent) clearly shows that the juror believed he was bound by whatever figure the average that was taken revealed.

In addition, three other jurors testified as follows:

"THE COURT: Did you all agree—did you all agree before you averaged the percentage of fault that that would be the verdict of the jury?
"Juror [J.B.]: Yes.
"THE COURT: . . . When you all agreed to do the average, was that the method that you were going to try to come to a number and did you all agree ahead of time that would be the number of the verdict no matter what? Meaning is this just the process to get to number or was this going to be the final vote, final verdict of the jury?
"Juror [N.S.]: The final.
"THE COURT:—was that to be the final number of the jury or was that to be a number that you all were still going to discuss?
"Juror [M.G.]: It's a final."

When we look back to the standard of review which states that whether a verdict was an improper quotient verdict is a question of fact for the trial court's determination, *Jones*, 261 Kan. at 618, it is clear that there was substantial competent evidence upon

which the trial court in this case based its decision. As was said in *Evenson Trucking Co. v. Aranda*, 280 Kan. 821, 836, 127 P.3d 292 (2006): " 'Substantial evidence is that which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved.' [Citations omitted.]"

The evidence heard by the trial court clearly justified its findings that an improper quotient verdict was reached and that a new trial must be ordered.

I disagree with our majority's conclusion that juror testimony was insufficient to show a quotient verdict was reached. The majority reaches a different legal conclusion, but I find it compelling that the trial court reached its decision to grant a new trial "after having closely looked at and listened to each juror as they testified." The trial court was clearly in the best position to examine the credibility of the witnesses.

Ultimately, our decision on appeal on the issue of the propriety of granting of a new trial is based on the first syllabus of *City of Ottawa*, 236 Kan. 417, which we earlier quoted in full. The decision below rests on the judicial discretion of the trial court, which will not be reversed by an appellate court unless a clear abuse of discretion is shown.

The trial court's comprehensive decision is soundly reasoned and based on factual findings supported by substantial competent evidence. It was not arbitrary, it was not fanciful, and it was not unreasonable. Reasonable persons could clearly differ as to the propriety of the ruling of the trial court. It cannot be said that the trial court abused its discretion.

For all of the reasons stated, I respectfully dissent from the ultimate result reached by the majority herein, and I would affirm the trial court.