No. 48,014

KEVIN DEAN BARNETT, a minor, by and through his mother and natural guardian, CAROL BARNETT, *Appellant,* v. HAWK PHARMACY, INC., a corporation, and C. T. HINSHAW, M. D., *Appellees.*

(552 P. 2d 1002)

Opinion filed July 23, 1976.

*Bradley Post,* of Michaud, Cranmer, Syrios, Post and Levy, of Wichita, argued the cause, and *J. Harold Williams,* of the same firm, was with him on the brief for the appellant.

*William Tinker, Jr.,* of McDonald, Tinker, Skaer, Quinn and Herrington, of Wichita, and *George B. Powers,* of Foulston, Seifkin, Powers and Eberhardt, of Wichita, both argued the cause and were on the brief for the appellees.

The opinion of the court was delivered by

KAUL, J.: This is an appeal by plaintiff-appellant in a medical malpractice action in which the trial resulted in a jury verdict for plaintiff in the amount of $10,962.00. The injuries suffered by plaintiff resulted from the taking of a teaspoonful of undiluted lactic acid mistakenly administered by his mother. The overall contention is that the verdict was grossly inadequate.

Plaintiff-appellant, Kevin Dean Barnett, was born November 17, 1970, and was three years and ten months of age at the time of trial. When plaintiff was twelve days old he was hospitalized for a vomiting problem. Plaintiff was under the care and treatment of the defendant, Dr. C. T. Hinshaw, a pediatrician, who had practiced his profession in Wichita for forty-five years. While hos-

pitalized for the vomiting condition, Kevin was treated with atropine solution for the purpose of controlling his vomiting. During eight days of hospitalization Kevin was also given other medications including ascorbic acid, phenobarbital, activated charcoal, and lactic acid formula. Upon Kevin's release from the hospital his mother was given two prescriptions by Dr. Hinshaw. One prescription was for atropine solution and the other for lactic acid. The atropine prescription directed that one teaspoonful of the solution be given fifteen minutes before feeding. The lactic acid prescription directed that thirty drops be stirred into the baby's milk formula.

These two prescriptions, both being clear, colorless liquids, were filled by Hawk Pharmacy, Inc., and dispensed in identical amounts (four ounces) in identical amber colored bottles.

The evidence discloses that lactic acid is a corrosive poison if taken internally in its undiluted state but, if taken as directed, it will not cause injury. Neither Dr. Hinshaw nor the pharmacist warned Mrs. Barnett about the corrosive or dangerous propensities of lactic acid if not administered properly. Although the dosage for lactic acid was prescribed in drops, a dropper bottle was not used by the pharmacist because this type of container was not available in the four-ounce size prescribed by the doctor.

After receiving the bottles from Hawk Pharmacy, Mrs. Barnett went home and began mixing the milk formula. Since no dropper came with the bottle of lactic acid she called Dr. Hinshaw and inquired about ". . . how much thirty drops was. . . ." She was informed by the doctor that an eyedropper, she had obtained previously, would be okay for use in measuring the lactic acid. She fed the plaintiff the atropine solution and the formula containing thirty drops of lactic acid at 7:00 p. m. on December 17, 1970. Mrs. Barnett placed the two bottles on opposite sides of her kitchen sink and set her alarm clock to sound at 12:45 a. m., the following morning, for Kevin's next scheduled feeding. At 12:45 a. m. Mrs. Barnett awoke and gave Kevin a teaspoonful of what she thought was atropine solution. Unfortunately, instead of atropine, she mistakenly fed him one teaspoonful of undiluted lactic acid.

Mrs. Barnett, a high school graduate, testified she did not know at that time that lactic acid was corrosive, but she did associate acid with potentially corrosive and caustic items. She admitted on cross-examination that on the night in question she did not look at the bottle or label before pouring the medication into a teaspoon.

After giving Kevin the lactic acid, Mrs. Barnett, apparently from his reaction to the medicine, immediately realized something was wrong. She awakened her husband, who immediately asked— "are you sure you have given him the right medicine?" Mrs. Barnett went to the kitchen and came back to report that she had given the wrong medication. Her husband then suggested that she call Dr. Hinshaw and see what they should do. Mrs. Barnett called Dr. Hinshaw and related what had happened. According to her testimony he told her to give the child some water, but failed to stress that it was imperative that she get fluids down him immediately, and that the lactic acid could, otherwise, be corrosive or dangerous. She denied that the doctor told her to give him soda water.

Dr. Hinshaw testified to the contrary that, upon being notified of the mistake, he ordered bicarbonate of soda and water and asked Mrs. Barnett to call him back.

Following this telephone call Mrs. Barnett tried without success for more than thirty minutes to get Kevin to drink from a bottle. She did not attempt to telephone Dr. Hinshaw after her unsuccessful attempt to get Kevin to take the water. She had no further conversation with the doctor until 4:00 a. m., approximately three hours after the initial conversation, when Dr. Hinshaw telephoned and asked her about Kevin. During the 4:00 a. m. telephone conversation, Mrs. Barnett reported that she had had no success with the previous instructions. Receiving this information, Dr. Hinshaw immediately went to plaintiff's home. For approximately an hour Dr. Hinshaw also tried to get Kevin to drink milk, as well as water. The doctor then left for about fifteen minutes and returned, stating Kevin would have to be taken to the hospital. He gave Kevin a shot of penicillin. His mother then took Kevin to Wesley Medical Center.

Subsequently, it was determined that Kevin had sustained burns on his tongue, lining of his mouth and pharynx due to the undiluted lactic acid. Scar tissue ultimately caused a stricture of the esophagus, approximately "one and a half to two inches" in length, necessitating several surgical procedures. For several months Kevin had an artificial opening in his stomach and a tube in his nose and throat for the purpose of procedures to dilate the stricture of the esophagus. He was hospitalized for eighty-seven days at a total expense for medical and hospital treatment of $10,312.10. The residual effects of the injury were scar tissue in the esophagus,

scars on his neck and abdomen, gagging or choking on his food two or three times a week, and an increased susceptibility to vomiting. There was also testimony that as Kevin grows older, further treatment and surgery may be needed. Kevin, however, was in general good health at the time of trial and had had no problems for sixteen months.

On January 12, 1973, this action was filed seeking damages from Dr. Hinshaw and Hawk Pharmacy, Inc., a corporation. Plaintiff's petition alleged joint and concurrent negligence on the part of both defendants. The defendants filed separate answers denying negligence and alleging certain affirmative defenses.

On August 8, 1974, a pretrial conference was held at which plaintiff stated his claims against each defendant. Plaintiff specified six acts of negligence against Dr. Hinshaw as follows:

"1. Failure to instruct or warn plaintiff's mother that undiluted lactic acid would be harmful and dangerous.

"2. Simultaneously writing two baby prescriptions for clear, colorless liquids in identical quantities, with full knowledge that one was a corrosive poison, without specifying a dropper bottle.

"3. Failure to specify sufficient warning labels for the lactic acid prescription or other means to clearly distinguish the corrosive lactic acid prescription.

"4. Failure to adequately instruct and inform plaintiff's mother of the corrosive nature of lactic acid, the importance of immediate treatment and neutralization of the lactic acid and the proper treatment and procedures to be followed when advised the plaintiff had received undiluted lactic acid.

"5. Failure to instruct plaintiff's mother to give plaintiff milk.

"6. Failure to provide emergency treatment to neutralize the lactic acid and to immediately hospitalize and care for plaintiff after being notified that undiluted lactic acid had been ingested."

On September 20, 1974, plaintiff was granted leave to amend the pretrial order by adding a seventh allegation of negligence against defendant Hinshaw. It reads:

" 'Prescribing four ounces of lactic acid which was more than necessary to meet the immediate needs of plaintiff.' "

In the meantime, a settlement between plaintiff and defendant Hawk Pharmacy, Inc., was negotiated and on September 27, 1974, the trial court approved a settlement in the amount of $20,000.00, and entered judgment accordingly.

On September 23, 1974, this case came on for trial. After a four-day trial the jury, as previously noted, returned its verdict for plaintiff in the amount of $10,962.00. Defendant's liability was dis-

charged by reason of the settlement judgment against Hawk Pharmacy. In this connection the journal entry of judgment reads:

"The court, on Monday, September 23, 1974, approved a settlement between the plaintiff and Hawk Pharmacy, Inc., in the amount of $20,000, which sum has been paid to the Clerk of this court. The court finds that said sum is a credit against the verdict and judgment of the jury in favor of the plaintiff and against the defendant. The court further finds that said credit is in excess of the verdict and judgment and therefore no sums are due from defendant to plaintiff."

From the judgment as entered plaintiff has appealed.

The principal contention advanced by plaintiff, and the one we consider of gravest import, is that the verdict was so grossly inadequate as to require a new trial. Plaintiff points out that the verdict exceeded the undisputed actual medical expense by only $649.90. Intertwined with this contention is plaintiff's further assertion that notes sent in by the jury during deliberations, considered in the light of the small verdict, indicates the jury compromised the issues of liability and damages. Plaintiff points out that the trial record and posttrial affidavits show that the jury was deadlocked on the first six specifications of negligence and agreed only on the seventh. Counsel says the jury then proceeded to allocate twelve percent of plaintiff's damages to the one point of negligence on which the jury was able to agree. This result, counsel argues, was in effect a special verdict, not authorized by the instructions, plus a hung jury, as to eighty-eight percent of the damages.

The record reveals a bitterly contested and intensely tried lawsuit. The evidence was in sharp conflict. Both sides called highly qualified expert witnesses. William L. Doane, M. D., board certified in the field of family practice and specializing in pediatrics, testified by deposition for the plaintiff. Dr. Doane testified that giving water to an infant who had swallowed undiluted lactic acid "would be a very incomplete and inadequate mode of treatment." Dr. Doane further testified that:

". . . [T]he standard approved medical practice would be to give some protein type of material that would render the lactic acid inert, something like milk or eggs that would be readily available in the usual home setting and then immediately to transfer this child to a hospital facility where more definitive and exact and complete care could be rendered."

Richard Allen Guthrie, M. D., a board certified pediatrician and chairman of the department of pediatrics at Wichita State University, was called by defendant and testified in person. Contrary to plaintiff's medical witnesses, Dr. Guthrie testified that ordering

water, as Dr. Hinshaw did, was appropriate; that milk would have been inappropriate in this case because it might have caused vomiting due to plaintiff's vomiting problem; and that vomiting would have brought the acid back into the baby's mouth and esophagus, causing additional injury and pneumonia. Dr. Guthrie further testified that Mrs. Barnett probably would have been more successful in getting plaintiff to take liquids than anyone else, including the hospital staff, because of the baby's familiarity with his mother. He also said that to have hospitalized immediately after the accident would have caused a delay in getting the patient treated. In conclusion Dr. Guthrie testified that he found nothing inappropriate or wrong in the way Dr. Hinshaw conducted the treatment before and after the accident.

Concerning damages, there is no hint in the record that the jury received any information or learned anything about the Hawk Pharmacy, Inc., settlement. Mr. Barnett, Kevin's father, testified that the Barnetts had been divorced and that he had agreed to and had paid all of the doctor and hospital bills for Kevin's treatment, but the jury was not instructed as to what effect, if any, should be given to Mr. Barnett's payment of the medical bills. The case was submitted to the jury solely on the premise that if it found for plaintiff the jury's verdict would constitute total compensation for medical expenses and pain, suffering, disabilities or disfigurement. Nevertheless, the jury's verdict exceeded the undisputed medical expenses by only $649.90.

It is apparent, from the record, that due to the conflicting medical testimony the jury had difficulty in determining the issue of liability. The jury deliberated more than two days before reaching a verdict. During deliberations the jury sent two notes to the court. The first read:

". . . 'Would you put in the record that the jury could only agree on one item, number seven of the plaintiff's claim.' "

The second note read:

". . . 'If this case is to be used as a precedent in future cases for the court record, may it be understood that the jury panel agree that the defendant was negligent only,' and only is underlined, 'in that he did not advise immediate hospitalization after being notified that the plaintiff had received lactic acid. See Item 7 on page 2 of the plaintiff's claim.' "

We believe the record strongly indicates a compromise on the issues of liability and damages.

It has become a well-established rule in this jurisdiction that

where there is ground for a strong suspicion the jury awarded inadequate damages to plaintiff as a result of a compromise involving the question of liability, the verdict should be set aside on motion for a new trial. (*Timmerman v. Schroeder,* 203 Kan. 397, 454 P. 2d 522; *Corman, Administrator v. WEG Dial Telephone, Inc.,* 194 Kan. 783, 402 P. 2d 112; and *Henderson v. Kansas Power & Light Co.,* 188 Kan. 283, 362 P. 2d 60.)

In discussing the import of the decision in *Henderson,* we said in *Schmidt v. Cooper,* 194 Kan. 403, 399 P. 2d 888:

". . . This decision was predicated on the premise that where, from conflicting evidence as to liability, or from other circumstances appearing in the case, it may plainly be inferred that the scantiness of the jury's verdict reflects a compromise on the issue of liability, a new trial should be ordered generally. . . ." (p. 407.)

From the conflicting evidence on liability, coupled with the jury's difficulty in determining the issue, as evidenced by the notes, it may be clearly inferred that the inadequacy of the verdict reflects a compromise by the jury involving the question of liability. Such a compromise infects the entire verdict and renders it totally invalid. (*Timmerman v. Schroeder,* supra.)

We are well-aware of the general rule that ordinarily the granting of a new trial rests in the sound discretion of the trial court and a ruling thereon will not be disturbed absent a showing of abuse of discretion or other manifest error. We are also cognizant of the rule that a jury is presumed to have acted fairly, intelligently and in harmony with the evidence and the further rule that the same yardstick must be applied to a claim of inadequate verdict as in a case where the verdict is claimed to be excessive. Even though plaintiff's motion for a new trial was denied by an able judge of long experience, in view of the persuasive evidence of a compromise verdict gleaned from the record, we feel compelled to hold that the ends of justice require a new trial.

In view of our disposition of the appeal, it is unnecessary to consider other points specified by the plaintiff.

The judgment approving the verdict is reversed and a new trial is ordered on all issues.