(221 P.3d 630)
No. 101,040

ERIN RENEE DUNCAN, as Administratrix of the Estate of James Jeffery Duncan, Deceased; ERIN RENEE DUNCAN, an Heir at Law of James Jeffery Duncan, Deceased; and MORGAN DUNCAN, HANNAH DUNCAN, MICHAEL DUNCAN, JOSEPH DUNCAN, and DAVID DUNCAN, Minor Heirs at Law of James Jeffery Duncan, Deceased, by and through Their Mother and Natural Guardian ERIN RENEE DUNCAN, *Appellees*, v. WEST WICHITA FAMILY PHYSICIANS, P.A., *Defendant*, and ROBYN HARTVICKSON, M.D., a/k/a ROBYN HARRIS, M.D., *Appellant*.

112

Opinion filed January 8, 2010.

*Steven C. Day* and *Chris S. Cole,* of Woodard, Hernandez, Roth & Day, LLC, of Wichita, for appellant.

*J. Darin Hayes, Mark B. Hutton,* and *Anne M. Hull,* of Hutton & Hutton Law Firm, LLC, of Wichita, for appellees.

Before GREENE, P.J., MALONE, J., and KNUDSON, S.J.

GREENE, J.: Dr. Robyn Hartvickson, a/k/a Robyn Harris, M.D., appeals a verdict against her in a medical malpractice action, principally arguing that the district court erred in giving the jury a so-called "hammer instruction" after a deadlock was perceived, and in denying her motion for a new trial based upon both circumstantial and direct evidence of an apparent compromise verdict. She also claims other errors were committed during the trial, but we do not reach these issues because we agree that her motion for new trial based upon jury misconduct should have been granted. We reverse the district court and remand for a new trial.

### Factual and Procedural Background

The widow and heirs of James Jeffery Duncan (Duncan) brought this medical malpractice action against Hartvickson after Duncan died from a large pulmonary embolism. The essential claim was that Hartvickson negligently diagnosed Duncan with pneumonia and failed to note and treat the embolism when Duncan presented himself to her for treatment on the day prior to his death.

At trial, plaintiffs' experts supported a departure from the standard of care in failing to explore the possibility of pulmonary embolism based on Duncan's symptoms. Hartvickson and her experts asserted that she met the standard of care, suggesting that the embolism was very recent in its formation and likely not evident when Hartvickson examined Duncan, thus verifying her diagnosis of pneumonia. The parties agree that liability of Hartvickson was hotly contested.

After approximately 2½ days of deliberations, the jury asked for the court's direction because its "last three votes [had] not

changed" and there was no "majority either way." Over Hartvickson's objection, the trial court then gave the jury what is commonly known as the deadlocked jury instruction under PIK Civ. 3d 181.20 and dismissed the jury for the evening. The following morning, the jury returned its verdict finding Hartvickson liable and awarding economic damages only totaling $982,143. Despite plaintiffs' extensive evidence of noneconomic loss, the jury awarded no such damages in its verdict.

After one of the jurors later contacted Hartvickson's counsel and suggested that the jury had reached a compromise verdict, Hartvickson timely filed a motion for new trial based on jury misconduct or, alternatively, for a recall of the jury. Following an affidavit and live testimony from the single juror only, the trial court denied Hartvickson's motion. Hartvickson appeals.

### *Standard of Review*

With regard to Hartvickson's claim of error based on the trial court's giving of the deadlocked jury instruction, we review the instructions to determine whether they are substantially correct statements of law and whether the jury could reasonably have been misled by them. *Hawkinson v. Bennett*, 265 Kan. 564, 577-78, 962 P.2d 445 (1998). Even if an isolated instruction is erroneous in some way, the instructions are not reversible error if they properly and fairly state the law as applied to the facts when considered as a whole. *State v. McKissack*, 283 Kan. 721, 732, 156 P.3d 1249 (2007).

With regard to Hartvickson's claim of jury misconduct, it is within the discretion of the trial court to grant or deny a new trial under K.S.A. 60-259(a), and such decision will not be disturbed on appeal except upon a showing of abuse of that discretion. *City of Mission Hills v. Sexton*, 284 Kan. 414, 421, 160 P.3d 812 (2007). A trial court abuses its discretion when it denies a motion for a new trial based on juror misconduct if the defendant can show that (1) an act of the jury constituted misconduct and (2) the misconduct substantially prejudiced the defendant's right to a fair trial. *State v. Mathis*, 281 Kan. 99, 103-04, 130 P.3d 14 (2006).

### *Did the District Court Err in Giving an Allen-type Instruction After the Jury Suggested Its Deadlock?*

After deliberating for more than 2 days, the jury sent a note to the trial court asking for directions. The note stated: "We have deliberated for two and one-half days. Our last three votes have not changed, and we do not have a majority either way. We seek the court's direction."

The court then consulted with counsel and suggested there were several options for response to the jury note, including to "bring them in, read them the hammer instruction, or else known as [PIK Civ. 3d 181.20], the deadlocked jury instruction and send them back to continue to deliberate." This instruction, also commonly referred to as an *Allen*-type instruction, has taken on this name due to its first being discussed in *Allen v. United States,* 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154 (1896). Plaintiffs asked that the instruction be given, but Hartvickson objected, noting that the Supreme Court "has recognized that it can cause a jury to make a decision on an improper basis, feeling undue pressure from the court." Notwithstanding this objection, the court decided to give the supplemental instruction, apparently based on the then-current version of the instruction, PIK Civ. 3d 181.20 (modified in 2008 to delete objectionable language; see PIK Civ. 4th 181.20).

The instruction, as given to the jury, stated:

"This is an important case. If you should fail to reach a decision, the case is left open and undecided. *Like all cases, it must be decided sometime.* There is no reason to believe that the case can be tried again any better or more exhaustively that it has been. There is no reason to believe that more evidence or clearer evidence would be produced on behalf of either side.

"Also, there is no reason to believe that the case would ever be submitted to twelve people more intelligent or more impartial or more reasonable than you. Any future jury must be selected in the same manner that you were.

"These matters are mentioned now because some of them may not have been in your thoughts.

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor.

If at all possible, you should resolve any differences and come to a common conclusion so that this case may be completed.

"The giving of this instruction at this time in no way means it is more important than any other instruction. On the contrary, you should consider this instruction together with and as a part of the instructions which I previously gave you.

"You may now retire and continue your deliberations in such manner as may be determined by your good judgment as reasonable people." (Emphasis added to illustrate the objectionable language no longer included in PIK Civ. 4th 181.20 [amended 2008].)

An instruction of this nature from the criminal context, specifically PIK Crim. 3d 68.12, has been heavily criticized by our appellate courts, especially when given after the jury announces a deadlock. In *State v. Boyd*, 206 Kan. 597, 600-01, 481 P.2d 1015 (1971), *cert. denied* 405 U.S. 927 (1972), our Supreme Court clearly warned against giving this instruction after a report of jury deadlock:

"[T]his court has criticized the giving of coercive charges of this character after the jury has received the case for its determination. [Citations omitted.] We reiterate our warning: The practice of submitting a forcing type instruction after the jury has reported its failure to agree on a verdict is not commended and may well lead to prejudicial error."

This warning is essentially reiterated in the civil context within both the Notes on Use and the Comment to PIK Civ. 4th 181.20 (amended 2008), where the following admonition is provided:

"The propriety of giving this instruction in criminal trials has been addressed on several occasions. Although few verdicts have been reversed because of giving the instruction after the jury has announced itself deadlocked, the court has been critical of the practice. In each case where the matter has been considered, the court has noted that trial courts would be well advised to submit the instruction before the jury retires to commence deliberations, not afterward."

Indeed, more recently our appellate courts have continued to criticize the instruction, often focusing on aspects thereof that are particularly misleading, technically incorrect, or inconsistent with other instructions. For example, in *State v. Scott-Herring*, 284 Kan. 172, 181, 159 P.3d 1028 (2007), the Supreme Court once again criticized the instruction, in particular the objectionable portion that was included here:

"We recognize that the phrase 'all cases . . . must be decided sometime' is not technically correct because a case may be resolved in any number of ways that do not involve a jury's verdict. However, we do not believe this technical error in the language warrants the reversal of Scott-Herring's conviction under our standard of review, which requires proper and fair instructions rather than technically perfect instructions."

See also *State v. Salts*, 288 Kan. 263, Syl. ¶¶ 2-3, 200 P.3d 464 (2009) (instruction criticized for inclusion of language that another trial would be a "burden" on both sides); *State v. Nguyen*, 285 Kan. 418, 436-37, 172 P.3d 1165 (2007) ("[T]he instruction as given is inaccurate and misleading . . . . [Nevertheless,] when the instruction accompanies all of the rest of the instructions given before deliberations, there is no error."); *State v. Carter*, 284 Kan. 312, 330-31, 160 P.3d 457 (2007) (no error when PIK Crim. 3d 68.12 provided before deliberations with all jury instructions); *State v. Anthony*, 282 Kan. 201, 215, 145 P.3d 1 (2006) (Defendant argued phrase " '[l]ike all cases, [this case] must be decided sometime' . . . misled the jury and exerted undue pressure for a verdict.").

Finally, we note that most recently, panels of our court have held that the giving of this instruction after a jury deadlock was announced was reversible error in the criminal context. See *State v. Pruitt*, 42 Kan. App. 2d 166, 173-75, 211 P.3d 166 (2009); *State v. Page*, 41 Kan. App. 2d 584, 585-87, 203 P.3d 1277 (2009).

Here, we must face the question whether the giving of the instruction in the civil context with some of its "technically incorrect" language after the jury has announced a deadlock was reversible error. Approaching the question in steps, it is clear that the inclusion of the language "all cases . . . must be decided sometime" was technically incorrect and erroneous. This specific language no longer appears in PIK Civ. 4th 181.20 and—as noted above—has been criticized in the criminal context. *Scott-Herring*, 284 Kan. at 181. Moreover, giving the instruction after the jury has announced a deadlock was also erroneous. *Pruitt*, 42 Kan. App. 2d at 175; *Page*, 41 Kan. App. 2d at 586-87. The inclusion of the bracketed language from PIK Civ. 4th 181.20, however, consisting of the last two paragraphs of the instruction utilized here and quoted above, instructing that the belated giving of the instruction should not be deemed

more important than other instructions, causes us to conclude that the giving of this instruction was not reversible error. Nevertheless, we believe that the belated giving of this instruction must be considered in our analysis below as a factor in assessing the alleged jury misconduct.

Clarifying our holding on this issue, a trial court risks error in giving PIK Civ. 4th 181.20 (amended 2008) in a civil case after the jury has announced a deadlock. The risk of error is magnified by the inclusion of language from prior versions of the PIK instruction, particularly that language expressly criticized by our appellate courts in the criminal context. Although the error is not structural in nature, the belated use of this instruction may be considered in determining whether undue coercion has been a factor in reaching a verdict.

### Did the District Court Abuse Its Discretion in Denying Hartvickson a New Trial Based on Jury Misconduct?

Hartvickson next contends the district court erred in denying her a new trial given the evidence of jury misconduct; she further contends that, at a minimum, the trial court should have recalled the jury to probe for further substantiation of jury misconduct. We begin our analysis by detailing the material facts bearing on these issues.

### Evidence of Jury Misconduct

When the jury was discharged, the district court instructed counsel to make no contact with individual jurors, faithfully following then-controlling law from this court's opinion in *Williams v. Lawton*, 38 Kan. App. 2d 565, 170 P.3d 414 (2007), which was later affirmed in part and reversed in part by the Supreme Court in *Williams v. Lawton*, 288 Kan. 768, 207 P.3d 1027 (2009). Sometime after the trial, however, an individual juror—R.T.—contacted Hartvickson's counsel to advise a concern about the verdict. After receiving permission from the court to speak to this juror, counsel obtained an affidavit from juror R.T. stating in material part:

"3. Turning to the jury's deliberations themselves, the members of the jury extensively discussed the case during more than two days of deliberations. During this time, before we sent the note to the Court advising that we were making no

progress, there had been several votes taken. Every vote taken ended with the jury split 7 in favor of the Plaintiff and 5 in favor of the Defendant on the issue of liability. The vote never changed. Although the votes were confidential, it became clear during deliberations where everyone stood. As time went on, the statements by the members of the jury panel became stronger and, for the most part, no one was demonstrating any willingness to change their position. At the beginning of the deliberations the conversation had been very polite, but as deliberations continued the situation was becoming more tense, with some individuals on opposing sides of the issue showing increasing irritation with each other;

"4.    We had deliberated part of the afternoon on Thursday, all day Friday and most of the day Monday when the decision was made to send the note to the Court indicating that we were making no progress and that no one was changing their position. When the Court's response was received, directing the jury to continue with its deliberations, while I do not remember words, there were expressions of frustration on the part of certain jurors. The Court's direction for us to continue deliberations came late in the afternoon and after brief discussion of what to do the decision was made to go home for the evening;

"5.    The next day, Tuesday, December 4, 2007, the situation in the jury room was unchanged. I do recall one or more members of the jury expressing concern that the ten days of paid leave they would receive from their employers for jury duty either had now run or would soon run. Fairly early in the deliberations on Tuesday morning, I told an analogy of a farmer with two mules and three bales of hay. The two mules kept trying to reach for the hay bales on the outside, but could not reach them. I pointed out that if the two mules would compromise, they would both be able to be fed from the hay bale in the middle. A couple hours later, when it became clear that nobody was going to change their vote, I then suggested, as a juror who had been speaking very strongly for the defense, that I would be willing to consider voting for liability as part of a compromise under which very low damages would be returned. *All of the members of the jury agreed to this approach.* There was continuing discussion over what would constitute an acceptable low verdict as part of the compromise. I argued for a lower verdict, perhaps two years of lost wages, while other jurors who had been in favor of the Defendant on liability were willing to go somewhat higher. At one point during the discussions of damages, the presiding juror made a comment, seemingly inconsistent with our compromise, to the effect that the jury had already decided liability. I spoke up and stated that was not true, but that any finding of liability was tentative, based upon our ability to arrive at an agreed upon low verdict for damages. Many other members of the jury panel, both those who had favored the Plaintiffs and those who had favored the Defendant spoke up to agree with me. By the end of this discussion, *all of the jurors agreed that any agreement to find liability was tentative based upon completion of a compromise where a low damage verdict would be returned in exchange for a finding of liability*. Due to the recognized difficulty in assigning a dollar value to non-

monetary damages, and in the spirit of compromise, the consensus was to not award any non-monetary damages.

"6.   The final verdict returned by the jury was reached on the basis of that compromise." (Emphasis added.)

This affidavit became the basis for Hartvickson's motion for new trial, and the district court conducted an evidentiary hearing on that motion that included live testimony from the same juror. Juror R.T. confirmed that, in four votes of the jurors taken during deliberations, the vote was always 7-5 in favor of the plaintiffs on liability. He testified that when it became clear that no one was going to change their vote he suggested that he would be willing to consider voting for liability as a part of a compromise under which very low damages would be returned. All votes prior to the "compromise" indicated that seven jurors voted in favor of plaintiffs on the issue of fault and five were in favor of the defendants. Juror R.T. testified that all of the members agreed to the approach, and two or three jurors thanked him for suggesting the compromise. Key excerpts from Juror R.T.'s testimony include:

"THE COURT: Do you remember any specific word other than that's a good idea?

"JUROR R.T.: No, except it was unanimous.

"THE COURT: When you say it was unanimous, how—how did the jury indicate that this was going to be unanimous? Did you all take a vote?

"JUROR R.T.: We didn't take a vote. We asked around the room—the presiding juror asked around the room if everyone agreed with this and every one nodded assent, yes. It wasn't a written vote like we had before.

. . . .

"THE COURT: . . . I want you to look at Paragraph 6 of your affidavit [verdict reached on basis of compromise]. Do you see that?

"JUROR R.T.: . . . Yes, sir.

"THE COURT: Do you still stand by that statement?

"JUROR R.T.: Yes.

"THE COURT: Okay. Other than what you have already said here today, are there any additional statements or actions of the jury that you can recall that would cause you to make that statement? And you can take your time.

"JUROR R.T.: It wasn't so much words, as a nonverbal feeling of relief that we were making progress whenever I commented because prior to that people had their opinions very solidly formed. Nothing was going to change their minds. That was very clear. We were just ab—from the first vote on we were absolutely deadlocked. We tried to discuss things and it was clear that minds were made up and

nobody was going to change their mind. And it seemed like when I suggested this about—without being biblical, it's like floodgates opened. It was a sense of co-operation all of a sudden. It was a—a sense of progress or something. It's hard to—I can't describe it so much in words as more of a feeling. People were—it was a relief. It was, yes, we can get something done here. We're not just locked up anymore. And I wouldn't say we were happy, but it was not this entrenched, just absolute rigidity that we had been experiencing. There was a—just a sense of cooperation or relief."

The unanimous agreement that a fault finding was contingent on an agreeable damages award was reinforced by jurors' responses to the presiding juror starting to fill in the front of the verdict form (on fault) before there had been agreement on the damages. At one point during the discussion, the presiding juror started to fill in the front of the form, and juror R.T. told him to stop because they had yet to agree on damages. Juror R.T. testified to what then transpired as follows:

"The form— that he was starting to write on the front of the form. And I said please don't do that, we haven't agreed on the damages yet. And we agreed that we aren't going to find for liability until we have agreement on damages. At which point he did say we've already found liability. And everyone in the room, every single person denied that and said no, we have not."

Ultimately, the district court denied the motion for new trial and the request to recall the jury. In a 37-page memorandum opinion, the court concluded that Hartvickson had not met her burden to prove that she was entitled to a new trial under K.S.A. 60-259(a) *First, Second,* or *Third.*

### *Jury Misconduct Based on Compromise Verdict*

Juror misconduct is not grounds for a new trial unless it is shown to have substantially prejudiced a party's rights, and the party claiming prejudice has the burden of proof. *Butler v. HCA Health Svcs. of Kansas, Inc.*, 27 Kan. App. 2d 403, 408, 6 P.3d 871, *rev. denied* 268 Kan. 885 (1999). Juror misconduct which results in prejudice to a litigant and impairs his or her right to a fair trial requires a new trial. *Huffman v. Thomas*, 26 Kan. App. 2d 685, 695, 994 P.2d 1072, *rev. denied* 268 Kan. 886 (1999). The burden is therefore on Hartvickson to prove jury misconduct and that the misconduct was to such degree that her rights were substantially affected. The district court rejected plaintiffs' argument that Hart-vickson did not have standing to object to the verdict, finding that

a defendant is aggrieved when the jury has not had a full and complete deliberation on the issue of fault.

The danger of compromise verdicts is well stated in a California case cited by Hartvickson:

" 'Verdicts are sometimes rendered in personal injury or death actions that, in view of the evidence of injuries, suffering, and medical and other expenses, are clearly inadequate. Common experience suggests that these are the result of compromise, some jurors believing that the evidence fails to establish liability, but yielding to the extent of agreement on a small recovery. It would be unfair to the defendant to ignore this unmistakable evidence of compromise and to accept the verdict for the plaintiff at face value as a determination of liability. Accordingly, it is well settled that the error calls for a general new trial, and a limited order is an abuse of discretion.' [Citations omitted.]" *Lauren H. v. Kannappan*, 96 Cal. App. 4th 834, 840, 117 Cal. Rptr. 2d 484 (2002).

There are two methodologies to analyze whether there has been juror misconduct in compromising a verdict. First, our appellate courts have examined the question based upon objective circumstances; under this approach, there is usually no direct evidence from one or more jurors of misconduct. The second methodology is based on an assessment of the direct evidence of misconduct and is usually based upon affidavits or testimony of jurors. Here, the district court rejected a finding of misconduct under both standards.

Under the objective circumstances test, we examine three objective criteria to determine whether there has been a compromise verdict. The district court cited a Tenth Circuit of the Court of Appeals case which summarizes these objective factors, stating:

"To determine whether a verdict is the result of jury compromise, we look at several factors. In particular, a damages award that is grossly inadequate, a close question of liability, and an odd chronology of jury deliberations are all indicia of a compromise verdict. [Citation omitted.]" *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1445-56 (10th Cir. 1988).

Each of these criteria is based on Kansas case law. *Barnett v. Hawk Pharmacy, Inc.*, 220 Kan. 318, 323-24, 522 P.2d 1002 (1976) (where there is an inadequate damages award after a lengthy deliberation marked by a series of strange questions from the jury, there is a strong indication of compromise); *Timmerman v. Schroe-*

*der*, 203 Kan. 397, 401, 454 P.2d 522 (1969) (a genuine conflict in the evidence on the issue of liability is required to raise any strong suspicion that a verdict awarding inadequate damages was a result of compromise).

In *City of Ottawa v. Heathman*, 236 Kan. 417, 421-26, 690 P.2d 1375 (1984), the Supreme Court distinguished cases applying the objective criteria from those where there is some direct evidence of misconduct:

> "In all of these cases [of circumstantial evidence,] it was evident from the verdict reached that the jury had acted in contravention of the court's instructions and of the evidence. Disregard of the instructions was sufficient cause for the courts to grant a new trial. In the present case, it is not evident from the jury's verdict that the jury failed to follow the court's instruction. In fact, the trial court specifically found that the verdict was not contrary to the evidence, but was within the range of damages contained in the evidence. The court learned of the jury's failure to follow instructions only after the filing of the juror's affidavit and upon questioning the jurors at the hearing on the motion for a new trial. Whether this evidence could be used in determining whether to grant a new trial is a separate issue. [The court had already cited and discussed cases where it was evident from the verdict reached that the jury had acted in contravention of the court's instructions and of the evidence.]
>
> . . . .
> "Misconduct by the jury, when it occurs, may be uncovered and the truth and veracity of those testifying to such misconduct can be tested. The matters set forth in the affidavits, if proven, must establish a conscious conspiracy by the members of the jury to disregard and circumvent the instructions on the law given by the court. If they do so, the jurors would have violated their oaths as jurors." 236 Kan. at 424-25.

### *Applying These Standards to the Evidence*

Turning to the objective circumstances first, we note that the parties agree that liability was hotly contested here. Moreover, the relatively short period of deliberations required for a verdict following the issuance of the *Allen*-type instruction must be viewed as an odd sequence raising suspicion of compromise. See *Skinner*, 859 F.2d at 1446 (sudden arrival at unanimity after struggling for days as to liability raises a question of verdict reliability). Thus, the key question is whether the damages award here could be deemed "inadequate."

Making an argument regarding inadequate damages puts a defendant in the interesting position of arguing that the damages awarded to the plaintiff were not sufficient and that the evidence in fact supported a higher damages award. Hartvickson argues that "plaintiffs offered substantial and largely uncontroverted evidence in support of their right to recovery" for seven separate categories of damages, both economic and noneconomic. She argues there was an "ocean" of testimony regarding the grief and bereavement of Duncan's wife and five children and, therefore, the jury awarding nothing for noneconomic damages demonstrates a compromise verdict. Hartvickson argues that the absence of pain and suffering damages would be understandable if there had been a large economic damages award, which she argues was not given in this case. Although Hartvickson argues the economic damages award was low, however, she does concede that it was within the evidence.

Our review of Kansas case law reveals that our appellate courts have often concluded that a verdict that exclusively awards economic damages but ignores evidence of noneconomic damages is inadequate and indicative of compromise. See, *e.g.*, *Miller v. Zep Mfg. Co.*, 249 Kan. 34, Syl. ¶ 5, 815 P.2d 506 (1991) (a jury award limited to medical expenses that includes nothing for pain and suffering shown by uncontradicted evidence disregards the jury instruction and is contrary to the evidence, and a new trial is required); *Barnett*, 220 Kan. at 323-24 (verdict for only $649 in excess of actual medical expenses where plaintiff sought an award for pain, suffering, disability, or disfigurement supported strong suspicion of compromise); *Timmerman*, 203 Kan. at 401 (verdict awarding medical expenses but nothing for pain and suffering or permanent injury supported new trial based on compromise verdict); see also *Burton v. R.J. Reynolds Tobacco Co.*, 208 F. Supp. 2d 1187, 1212-13 (D. Kan. 2002) (failure to award noneconomic damages "raises an eyebrow," but where total amount of damages was not grossly inadequate, verdict may not be set aside). Suffice to say that the failure to award noneconomic damages under all the circumstances of this case raises a strong suspicion of compromise. We need not decide whether our objective factor analysis alone supports a new

trial, however, because there was also direct evidence of jury misconduct.

Here, there was compelling evidence that a unanimous jury agreed to a compromise that would break a deadlock caused by five persistent jurors who had consistently voted against the liability of Hartvickson. Based upon the compromise, the only juror to testify indicated that at least he, and four other jurors, agreed to find Hartvickson liable, despite previous votes against a finding of fault, in exchange for "very low damages." Such an agreement is contrary to basic negligence law—requiring a finding of fault as a result of negligence before damages are determined. See *Hunter v. Barnsdall Refining Co.*, 126 Kan. 277, 281, 268 P. 86 (1928) (It is elemental that negligence of defendant must be established before recovery can be had in a common-law action for damages.).

This compromise agreement by the jury violated other instructions given to the jury. Jury Instruction 6 stated in part: "A party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which claim is made." The jury seemed to understand that it was required to first find Hartvickson at fault as indicated by several votes solely on the issue of fault before the compromise was presented. Additionally, the jury was clearly instructed that the answer to *each* question must be made by the agreement of ten or more jurors. Based on Juror R.T.'s testimony, it was only through this compromise agreement that the jury ended up with more than 10 jurors in agreement as to liability.

Finally, based on Juror R.T.'s testimony, it does appear that the jury disregarded the verdict form by finding an agreeable damages amount before finding Hartvickson was at fault. Juror R.T.'s affidavit stated that the members agreed that any finding of liability was "tentative and based upon completion of a compromise where a low damage verdict would be returned in exchange for a finding of liability." The verdict form asked the jury in Question 1: "Do you find the defendant to be at fault?" and then told the jurors to proceed to Question 2 only *if* you answered "yes" to question 1. This mandatory sequence was clearly violated by the agreement to compromise.

We understand and respect the contrary conclusion reached by the district court. From our careful review of the court's memorandum opinion, we conclude that the district court reached its contrary conclusion primarily due to two reasons: (1) The court was especially mindful of and faithful to the then-recent opinion of this court in *Williams v. Lawton*, 38 Kan. App. 2d 565, 170 P.3d 414 (2007), *aff'd in part and rev'd in part* 288 Kan. 768, 207 P.3d 1027 (2009),which held that a quotient verdict was not apparent in that case, thus requiring that this same district judge be reversed; obviously, this proved unwise given the later reversal in part by our Supreme Court; and (2) the court seems to have been testing the evidence of a compromise verdict by the principles for testing the evidence of a quotient verdict; suffice to say, these two forms of jury misconduct are entirely different, and the definition and standard to test for each are mutually exclusive of the other. Compare *Blevins v. Weingart Truck & Tractor Service*, 186 Kan. 258, 263-64, 349 P.2d 896 (1960) (quotient verdict), with *Heathman*, 236 Kan. at 421-26 (compromise verdict).

We thus conclude that based on objective factors that lead to a strong suspicion of misconduct, corroborated with direct evidence from the single juror, there was jury misconduct in its compromise of liability in exchange for reduced damages and that this misconduct substantially prejudiced the defendant's right to a fair trial. Our conclusions are buttressed not only by the wholesale failure to award noneconomic damages in a case where liability was hotly contested, but also by the relatively quick achievement of unanimity after the district court gave the belated *Allen*-type deadlocked jury instruction under PIK Civ. 3d 181.20 and by the compelling testimony of the juror who reported the compromise to defense counsel. These conclusions warranted a new trial, and the district court's denial of Hartvickson's motion was an abuse of discretion. See *State v. Mathis*, 281 Kan. 99, 103-04, 130 P.3d 14 (2006).

Reversed and remanded for new trial.